UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| Katherine M. Cleary, *et al.*, Individually and on behalf of others similarly situated. | Civil Action No. 4:21-cv-00184-O |
| Plaintiffs, | Hon. Reed O'Connor, USDJ |
| v. | Hon. Hal R. Ray, Jr., USMJ |
| American Airlines, Inc., | |
| Defendant. | |

**PLAINTIFFS' AND CLASSES' MEMORANDUM OF LAW IN OPPOSITION TO
AMERICAN AIRLINES, INC.'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES…………………………………………………………… iv

I.   INTRODUCTION…………………………………………………………………. 1

II.   FACTUAL AND PROCEDURAL BACKGROUND………………………………... 3

III.   AA IS CONTRACTUALLY BOUND BY THE BAGGAGE FEES REPRESENTED IN E-TICKET EMAILS SENT TO EMAIL CLASS MEMBERS……………………………4

    A.   THE E-TICKET EMAIL IS PART OF THE CONTRACT…………………….. 4

    B.   THE BAGGAGE FEES IN THE E-TICKET EMAIL IS AN ENFORCEABLE TERM OF THE EMAIL CLASS'S CONTRACT WITH AA…………………………… 6

    C.   CONFUSING AND CONTRADICTORY STATEMENTS IN AA'S E-TICKET EMAILS DO NOT RENDER THEM UNENFORCEABLE…………………………… 7

    D.   FEDERAL REGULATIONS REQUIRE AA TO SEND PERSONALIZED CONFIRMATION OF BAGGAGE FEES FOR EACH TICKET ………………………8

    E.   AA DID NOT MAKE A "MISTAKE" OR "ERROR" IN THE E-TICKET EMAILS …………………………………………………………………………...9

    F.   EQUITABLE REFORMATION IS NOT AVAILABLE TO EXCUSE AA'S BREACH …………………………………………………………………………...11

        1.   AA Waived its Equitable Reformation Defense………………………….. 11

        2.   AA Did Not Make a Bona Fide Mistake, and has Unclean Hands, which Prevents Equitable Reformation…………………………………………… 12

IV.   AA'S LIMITED CLASS ACTION WAIVER CLAUSES DO NOT SUPPORT ANY DISMISSAL …………………………………………………………………………...16

    A.   THE CLAUSE ADDED TO THE CoC IN APRIL 2020 DOES NOT SUPPORT DISMISSAL OF THE PLAINTIFFS' CLAIMS OR ANY CLASS MEMBERS' CLAIMS………………………………………………………………………… 17

    B. AA's Defective Contract Formation Process Renders Its Class Waiver Unenforceable…18

    C.   THE LIMITED WAIVER CLAUSE IN AA'S SITE USAGE POLICY DOES NOT SUPPORT DISMISSAL OF PLAINTIFFS' OR ANY CLASS MEMBERS' CLAIMS………………………………………………………………………… 20

V.    AA WAS CONTRACTUALLY OBLIGED TO PROVIDE CREDIT CARD HOLDERS A FIRST CHECKED BAG FREE ON ALL FLIGHTS…………………………………... 25

  A.    AA DOES NOT DISPUTE THAT CREDIT CARD CLASS MEMBERS WERE ENTITLED TO A FREE FIRST CHECKED BAG FOR DOMESTIC FLIGHTS……... 25

  B.    AA'S CREDIT CARD OFFERS ARE CRYSTAL CLEAR AND AMPLY DEFINITE……………………………………………………………………… 27

  C.    THE CITED EXAMPLES CONFIRM THAT AA'S ADVERTISEMENTS ROUTINELY PROMISED "FIRST CHECKED BAG FREE" WITH NO INDICATION THAT AA WOULD PROVIDE THIS BENEFIT ON LESS THAN ALL OF ITS FLIGHTS. EACH OF THESE PROMISES WAS BOTH CLEAR AND DEFINITE IN PROMISING A SPECIFIC, PRECISE BENEFIT. THE CONTEXT OF AA'S CREDIT CARD OFFERS FURTHER SUPPORTS THE INCLUSION OF BENEFITS DURING INTERNATIONAL TRAVEL……………………………………………………….. 28

  D.    THE COURT SHOULD ENFORCE PROMISES MADE IN AA'S MARKETING OFFERING FREE CHECKED BAGS WITHOUT INTERNATIONAL LIMITATIONS……………………………………………………………………… 29

  E.    BY ITS OWN TERMS, AA'S COC IS NOT FULLY INTEGRATED………… 30

    1.    AA Relies on Documents Outside the CoC and CBP………………….......30

    2.    AA's Standard Form Documents State that "Additional Allowances and/or Discounts May Apply"……………………………………………………….. 31

  F.    THE CONTENT, STRUCTURE, AND OVERALL APPROACH OF THE CBP DO NOT SUPPORT AA'S CLAIM THAT MENTIONING DOMESTIC BENEFITS "IMPLIES" NO INTERNATIONAL BENEFITS…………………………………... 31

  G.    NO CONTINGENCY EXCUSES DISHONORING AA'S CREDIT CARD BAGGAGE PROMISE………………………………………………………… 34

  H.    CLASS MEMBERS BELIEVED "FIRST CHECKED BAG FREE" MEANS WHAT IT SAYS………………………………………………………………... 35

VI.    CLASS CLAIMS ARISING ON OR AFTER SEPTEMBER 16, 2013, ARE WITHIN THE APPLICABLE FILING PERIOD ……………………………………………………………35

  A.    THIS CASE WAS FILED ON SEPTEMBER 4, 2020………………………… 36

  B.    BECAUSE BAZERMAN TOLLED THE STATUTE OF LIMITATIONS FOR CLASS MEMBERS' CLASS CLAIMS, THE APPLICABLE FILING PERIOD BEGAN ON SEPTEMBER 16, 2013……………………………………………………….. 37

       1.     The Bazerman Class Action Tolled the Statute of Limitations…………... 37

       2.     Bazerman Tolled the Classes' Claims in this Action ……………………...39

    C.      BAZERMAN TOLLED CLASS CLAIMS FOR 1084 DAYS…………………... 41

VII.    FOREIGN CLASS MEMBERS' CLAIMS SHOULD NOT BE DISMISSED…………. 42

    A.     AA WAIVED THE "FOREIGN CLASS MEMBER" ARGUMENT BY FAILING TO RAISE IT AT CLASS CERTIFICATION………………………………………… 43

    B.     RES JUDICATA CONCERNS ARE NOT SO SIGNIFICANT THAT THE COURT SHOULD MODIFY ITS ORDER FOR CLASS CERTIFICATION………….44

VIII.  THE CERTIFIED CLASSES SHOULD BE PERMITTED TO ADD ADDITIONAL CLASS REPRESENTATIVES IF NECESSARY …………………………………………………47

IX.     CONCLUSION………………………………………………………………………… 47

## TABLE OF AUTHORITIES

**Cases**

*Am. Mfrs. Mut. Ins. Co. v. Schaefer,*
124 S.W.3d 154 (Tex. 2003)........................................................................20

*American Pipe & Constr. Co. v. Utah,*
414 U.S. 538 (1974) ..............................................................37, 39, 40, 41

*Anwar v. Fairfield Greenwich*
289 F.R.D. 105 (S.D.N.Y. 2013) ................................................................46

*Bagby Elevator Co. v. Schindler Elevator Corp.,*
609 F.3d 768 (5th Cir. 2010) ....................................................................13

*Bazerman v. Am. Airlines, Inc.,*
(D. Mass. July 13, 2017)....................................................................passim

*Bersch v. Drexel Firestone, Inc.,*
519 F.2d 974 (2d Cir. 1975) ......................................................................43

*Betances v. Fischer,*
403 F. Supp. 3d 212 ...................................................................................39

*Bexar C'nty Hosp. Dist. v. Factory Mut. Ins. Co.,*
475 F.3d 274 (5th Cir. 2007)................................................................8, 21

*Binh Hoa Le v. Exeter Fin. Corp.,*
990 F.3d 410 (5th Cir. 2021) ....................................................................12

*Buettgen v. Harless,*
263 F.R.D. 378 (N.D. Tex. 2009) ..............................................................43

*Carpenter v. Stephen F. Austin State Univ.,*
706 F.2d 608 (5th Cir. 1983)......................................................................47

*China Agritech v. Resh,*
138 S. Ct. 1800 (2018)................................................................39, 40, 41

*City of Wink v. Griffin Amusement Co.,*
100 S.W.2d 695 (Tex. 1937) ......................................................................13

*Convergys Corp. v. Nat'l Lab. Rels. Bd.,*
866 F.3d 635 (5th Cir. 2017) ....................................................................17

*Crown Cork & Seal Co. v. Parker,*
462 U.S. 345 (1983) ..............................................................37, 39, 40, 41

*Day v. Persels & Assocs., LLC*,
   729 F.3d 1309 (11th Cir. 2013) ................................................................................17

*De Los Santos v. Kroger Texas, LP*,
   2015 WL 3504878 n.2 (N.D. Tex. June 3, 2015) ......................................................14

*Dunnagan v. Watson*,
   204 S.W.3d 30 (Tex. App. 2006) ...............................................................................13

*Fieldtech Avionics & Instruments, Inc. v. Component Control.Com, Inc.*,
   262 S.W.3d 813 (Tex. App. 2008) .............................................................................21

*Gonzalez v. Mission Amer. Ins. Co.*,
   795 S.W.2d 734 (Tex. 1990) ........................................................................................8

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) .....................................................................................16

*Hart v. BHH, LLC*,
   2018 U.S. Dist. LEXIS 188189 (S.D.N.Y. Nov. 2, 2018) .......................................40

*Hung Cavalieri v. Avior Airlines C.A.*,
   25 F.4th 843, 2022 U.S. App. LEXIS 3184 (11th Cir. 2022) .....................................7

*Hunt v. CheapCaribbean.com, Inc*,
   2009 WL 10704881 (N.D. Tex. June 23, 2009) ........................................................21

*Ingraham v. United States*,
   808 F.2d 1075 (5th Cir. 1987) ...................................................................................12

*In re Capco Energy, Inc.*,
   669 F.3d 274 (5th Cir. 2012) .....................................................................................20

*In re Cobalt Int'l Energy, Inc. Sec. Litig.*,
   2017 U.S. Dist. LEXIS 91938 (S.D. Tex. June 15, 2017) ........................................44

*In re Vivendi Universal, S.A. Sec. Litig.*,
   242 F.R.D. 76 (S.D.N.Y. 2007) ................................................................. 43, 44, 45, 46

*In re U. S. Fin. Sec. Litig.*,
   69 F.R.D. 24 (S.D. Cal. 1975) ...................................................................................44

*Lagniappe Lighting, Inc. v. Bevolo Gas & Elec. Lights, Inc.*,
   2013 U.S. Dist. LEXIS 101777 (S.D. Tex. July 22, 2013) .......................................10

*Lavine v. Am. Airlines, Inc.*,

No. 2917, 2011 Md. App. LEXIS 158, n.8 (Md. App. Dec. 1, 2011)..................................................6

*Mississippi Protection & Advocacy Sys. v. Cotten,*
   929 F.2d 1054 (5th Cir. 1991)...................................................................................................47

*Ochoa v. Pershing LLC,*
   2021 U.S. Dist. LEXIS 214299 (N.D. Tex. Nov. 5, 2021)......................................... 40, 41

*Oden v. Oktibbeha Cty.,*
   246 F.3d 458 (5th Cir. 2001)....................................................................................................12

*Omni USA, Inc. v. Parker-Hannifin Corp.,*
   798 F. Supp. 2d 831 (S.D. Tex. 2011) ....................................................................................20

*Park v. Escalera Ranch Owners' Ass'n, Inc.,*
   457 S.W.3d 571 (Tex. App.—Austin 2015)............................................................................13

*Petrobras Sec. Litig.,*
   312 F.R.D. 354 (S.D.N.Y. 2016) ..............................................................................................45

*Powell, Inc. v. Abney,*
   669 F.2d 348, 350 (5th Cir. 1982)............................................................................................13

*Ranzy v. Extra Cash of Texas, Inc.,*
   2011 WL 13257274 (S.D. Tex. Oct. 14, 2011) ......................................................................17

*Retractable Techs., Inc. v. Becton Dickinson & Co.,*
   919 F.3d 869  n.50 (5th Cir. 2019) ..........................................................................................16

*Roman v. Spirit Airlines, Inc.,*
   2021 WL 4317318 (11th Cir. Sept. 23, 2021) ........................................................................17

*Salinas v. McDavid Hous.-Niss, L.L.C.,*
   831 F. App'x 692 (5th Cir. 2020) ............................................................................................10

*Sosna v. Iowa,*
   419 U.S. 393 (1975)..................................................................................................................47

*Specht v. Netscape Communications Corp.,*
   306 F.3d 17 (2d Cir. 2002) .......................................................................................................24

*St. Stephen's Sch. v. PricewaterhouseCoopers Accountants N.V.,*
   570 F. App'x 37 (2d Cir. 2014)................................................................................................47

*Stellar Restoration Servs. v. Courtney,*
   533 F. Supp. 3d 394 (E.D. Tex. 2021)......................................................................................8

*Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N Prop Invs., LLC,*
   481 S.W.3d 336, 351 (Tex. App.—Houston [1st Dist.] 2015) ........................................13

*Sun River Energy, Inc. v. McMillan,*
   2014 U.S. Dist. LEXIS 135086 (N.D. Tex. Sep. 25, 2014). ..........................................12

*Sw. Airlines Co. v. BoardFirst, L.L.C.,*
   2007 U.S. Dist. LEXIS 96230 (N.D. Tex. Sep. 12, 2007) ............................................24

*Taylor v. UPS, Inc.,*
   554 F.3d 510 (5th Cir. 2008) .....................................................................................40

*Troice v. Proskauer Rose Llp,*
   2015 U.S. Dist. LEXIS 198490 (N.D. Tex. Mar. 9, 2015)............................................44

*Wentwood Woodside I, IL v. GMAC Commercial Mortgage Corp.,*
   419 F.3d 310 (5th Cir. 2005) .....................................................................................10

**Rules and Statutes**

14 C.F.R. § 253.9 .......................................................................................................18

14 C.F.R. §399.85(c) ...................................................................................................9

28 U.S.C. § 1406(a) ...................................................................................................37

Fed. R. Civ. P. 8(c) ...................................................................................................12

Fed. R. Civ. P. 15 .....................................................................................................47

Fed. R. Civ. P. 23(b)(3) .............................................................................................43

Fed. R. Civ. P. 23(c). ..................................................................................................4

Tex. Civ. Prac. & Rem. Code Ann. § 16.501. ..............................................................36

## I.      INTRODUCTION

Defendant American Airlines, Inc. ("AA") routinely promises its passengers free checked baggage but then charges them for those same checked bags at the airport.  These promises appear in two places: (1) in E-Ticket Confirmation emails ("E-Ticket Emails") that set forth the terms of the E-Tickets issued by AA; and (2) in advertisements and solicitations for AA's co-branded credit cards.  The Court certified two classes of passengers who received free checked bag promises in E-Ticket Emails (the "Email Class"), and passengers holding co-branded credit cards (the "Credit Card Class"); jointly, the "Classes."  Following certification, class notice was sent to the 2.8 million members of the Classes identified by AA from its records.

This is not the first time AA has been sued for failing to abide by promises of free checked bags.  In *Bazerman v American Airlines, Inc.* (D. Mass.) AA agreed to refund baggage fees to a settlement class of passengers who received an E-Ticket Email promising a free bag.  Rather than fix the problems with its systems revealed in *Bazerman*, AA instead opted to let the problems—which AA attributes to a series of computer "glitches"—persist, placing the burden on its customers to hold AA to its promises.  Meanwhile, AA slipped an inconspicuous class waiver clause into its Conditions of Carriage ("CoC"), perhaps in an attempt to erect a shield from any liability for these serial breaches.

Class Counsel has uncovered many "glitches" (as AA calls them) and other errors that collectively resulted in more than one million AA Email Class members (whose claims were not released by *Bazerman*) being charged for bags in direct contravention of AA's representations in its E-Ticket Emails.  AA was aware of these defects but did nothing to alert members of the Email Class until the court-ordered notice to class members.

AA argues it should not be held to its promises to the Email Class members because (it says) the promises of free checked baggage in the E-Ticket Emails are not enforceable.  But the evidence

1

demonstrates that the E-Ticket Email, which sets forth the terms of the ticket, is an enforceable part of the contract between AA and its customers.

Next AA argues that it shouldn't be held accountable because it made certain free bag promises by mistake, but this argument fares no better.  If there was a mistake, it was AA's *unilaterial* mistake and thus presents no basis for invalidating AA's accepted contractual promise.  AA cannot cry "oops" (after contractual acceptance and payment) just because it doesn't like the deal it made. Moreover, AA has unclean hands, lacking a prerequisite for the contract reformation it seeks. Not only did AA fail to minimize the impact of its mistakes, it knowingly failed to preserve the evidence needed to determine if it made a mistake at all.

Attacking the claims of the  Credit Card Class, AA argues that a subset of that Class are not entitled to a free checked bag.  AA offers no defense for credit card holders charged for a first checked bag on domestic flights.  But for foreign flights, AA relies on language in its Checked Bag Policy ("CBP") which AA says provided that its free checked bag promise does not apply on international flights.  However, the CBP does not say this benefit applies *only* on domestic itineraries. Rather, the CBP is *silent* about foreign itineraries.  Contrast that with AA's pervasive advertisements for these credit cards, which broadly state:  "First Checked Bag Free."  Plaintiffs provide numerous examples of that offer and promise made with no limitation to domestic travel. *See* Plaintiffs' Appendix in opposition to AA's motion ("Plfs' SJ App'x") 6-287. AA should be held to the plain language of its offer after acceptance by the Credit Card Class.

Despite AA's awareness of this confusion caused by its marketing (through scores of customer complaints), *see* Plfs' SJ App'x 288-367, and the fact that AA has twice been sued about this, AA *continues* to advertise "First Checked Bag Free."  Clearly, AA likes Credit Card Class members believing they will get free bags on both domestic and international flights, but then charging for those bags at the airport.   The Court should reject AA's argument that its  marketing

offers are not enforceable.  The mixed evidence of AA's marketing promises suffices to create a triable issue of fact, which should be decided by a jury.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs filed this class action in September 2020 in the Central District of California.  That action was transferred by consent to this District on January 7, 2021, and assigned to Judge Pittman. Judge Pittman dismissed the action (without prejudice) for failure to comply with the requirement to file a certificate of interested persons.  Plaintiffs promptly refiled and the action was assigned to Your Honor.  On September 2, 2021, following full briefing, the Court certified the following two classes:

> All persons who purchased a ticket for air travel on American Airlines ('AA') subject to AA's promises in the…E-Ticket Confirmation Email [the Email Class] …or… credit card offers [the Credit Card Class] that their ticket would allow the passenger to check a specified number of bags for free, who were required to pay to check one or more such bags, during the period September 16, 2013, to the present.

Docket No. 66 at 5.

AA disputed the scope of the Classes and refused to provide any discovery on that basis.[1] Plaintiffs moved to compel and Magistrate Judge Ray agreed with Plaintiffs' interpretation of the scope of the Classes.  On November 24, 2021, Your Honor overruled AA's objections and affirmed that the class certification ruling meant what it said. Docket No. 119.

Following that Order, AA finally agreed to  identify members of the Classes so that class notice could be sent pursuant to FED. R. CIV. P. 23(c).  The Court approved Plaintiffs' proposed Notice and Notice Plan, which has been sent to approximately 2.8 million Class members.  Class members have until April 8, 2022 to opt-out.  To date, only 24 have done so.

---

[1] AA construed the Classes as confined to the exact circumstances of the Class Representatives.

III.   **AA IS CONTRACTUALLY BOUND BY THE BAGGAGE FEES REPRESENTED IN E-TICKET EMAILS SENT TO EMAIL CLASS MEMBERS**

AA argues that its E-Ticket Confirmation Email ("E-ticket Emails") are not part of the contract with passengers and therefore the free baggage promises in those emails are not enforceable. But this *post hoc* argument is belied by the explicit terms of AA's own CoCs, AA's Rule 30(b)(6) testimony, applicable federal regulations, and common sense.

A.   **THE E-TICKET EMAIL IS PART OF THE CONTRACT**

AA maintains that its CoC and "the documents incorporated by reference therein" constitute the contract between AA and its customers. Plfs SJ App'x 374-5 (*AA Responses and Objections to Plaintiffs' Second Set of Interrogatories*) Resp. No. 2 (5/28/21). The CoC explicitly incorporates the terms of a passenger's "ticket":

> **Your ticket** and the following Conditions of Carriage constitute the contract between you, the passenger, and American Airlines, Inc. ("American") and apply to all transportation provided by American (including transportation on codeshare partners*) between points in the United States (including Puerto Rico and the U.S. Virgin Islands). Foreign air transportation is governed by applicable tariffs on file with the Department of Transportation.

AA SJ App'x 6 (CoC (3/18/17)) (emphasis added).

The "ticket … including tickets issued electronically" (AA SJ App'x 219, CoC (2/18/19)) is defined as the document provided to customers that incorporates the ticket. *Id*; *see also* AA SJ App'x 7, *CoC* (3/18/17) ("Ticket - passenger ticket and baggage check **which incorporates these Conditions of Carriage**.") (Emphasis added). The only document that AA sends to customers that incorporates the CoC is the E-ticket Email. *See* AA SJ App'x 238-41. By its own terms, the E-Ticket Email thus constitutes the "ticket."[2] Indeed, it must—of all AA's contract documents, the E-Ticket Email is the only place stating the essential terms of the contract including the fare, the destination,

---

[2] AA argues that only terms "plainly" incorporated into an agreement are valid. AA SJ Br. at 25. The CoC expressly incorporates E-tickets, the terms of which are reflected in the E-Ticket Emails.

and the name of the passenger. As explained below, the ticket is also the document that confirms

checked bag benefits and fees for that particular passenger and trip.

 AA does not and cannot provide passengers with E-Tickets (aside from the E-Ticket Email)

because E-Tickets are merely lines of code saved in AA's computer system.[3] *See* Plfs. SJ App'x 403

(AA 30(b)(6) testimony at 104:9-23) ██████████████████████████████████████

████████████████████████).[4] Because a passenger cannot directly see code in AA's

computer system, AA sends an E-Ticket Email communicating the same information:



*Id.* at 380-1 (12:1-13:17). AA admits that the E-Ticket Email accurately reflects the terms of the E-

Ticket. *Id.* at 381 (14:22-25) ████████████████████████████████████████

███████████████████████████████████ ██ ████████

██████████

 Denying that its E-Ticket Email is part of the contract is particularly hollow because not

only does this contradict the CoC and AA's Rule 30(b)(6) and employee witness testimony, but also

AA took the opposite position in other litigation. *See Lavine v. Am. Airlines, Inc.*, No. 2917, 2011 Md.

App. LEXIS 158, at *11, n.8 (Md. App. Dec. 1, 2011) ("At oral argument, appellants asserted that

'there is no ticket,' while appellee responded that 'this [email] is their ticket for travel.' We are

---

[3] AA stopped using paper tickets about 15 years ago and has since relied exclusively on E-Tickets. *See* Plfs. SJ App'x 381 (AA Rule 30(b)(6) testimony at 15:1-17).

[4] As its Rule 30(b)(6) witness, Mr. Waller's testimony is binding on AA. *See Hijeck v. Menlo Logistics, Inc.*, No. 07-cv-0530-G ECF, 2008 U.S. Dist. LEXIS 12886, at *9 (N.D. Tex. Feb. 21, 2008) ("The purpose of Rule 30(b)(6) is to allow a corporation to present testimony through a representative who, after being prepared, 'presents the corporation's "position" on the topic.'") (quoting *Brazos River Authority v. GE Ionics, Inc.,* 469 F.3d 416, 433 (5th Cir. 2006)).

persuaded that the email or 'E-Ticket' functions as the 'ticket or other written instrument' for the purposes of 14 CFR 253.") (modification in original). The Court should reject AA's about-face.

The E-Ticket Emails are the tickets, and therefore part of the Email Class's contract with AA. This is no great surprise—these are AA's standard documents, sent automatically by AA's computers to AA's customers whenever they buy tickets.

### B. THE BAGGAGE FEES IN THE E-TICKET EMAIL IS AN ENFORCEABLE TERM OF THE EMAIL CLASS'S CONTRACT WITH AA

AA concedes that the E-Ticket Email is the way AA informs passengers of baggage fees. Plfs. SJ App'x 390 (AA 30(b)(6) testimony at 50:13-18) ████████████████████████

████████████████████████████████████████████████████████████████████

Nonetheless, when an AA customer checks a bag at the airport, inexplicably AA's systems do not check the E-ticket Email or the ticket. Instead, AA systems look for the baggage fee in a computer application (Sabre) used to determine the baggage fees reflected in the E-Ticket and E-Ticket Email. *See id.* at 409 (127:16-22) ████████████████████████████████████

████████████████████████████ However, when the baggage fees in AA's application and/or Sabre differ from the fees contained in the E-Ticket Emails, AA charges passengers for bags in violation of their contracts. AA has admitted this is wrong. In particular, AA's Rule 30(b)(6) witness and other AA management witnesses agree that AA must honor the baggage fees communicated to customers in E-Ticket Emails, and to the extent a customer was charged a higher amount at the airport, it must be refunded:



*Id.* at 392 (58:21-59:2) (emphasis added). Other AA management personnel likewise testified that AA must honor the baggage fees as represented in the E-Ticket Emails:



Plfs. SJ App'x 453 (100:20-101:13) (discussing email produced at Plfs. SJ App'x 480). █████████

█████ repeated that assessment concerning another complaining Email Class member charged

baggage fees after AA promised the bags would be free. *Id.* at 453 (98:23- 99:9) (discussing email

produced at Plfs. SJ App'x 482).

Because the E-Ticket Email *is* the ticket and therefore part of AA's contract with the Email

Class, AA breached that contract when it charged higher fees than confirmed in those emails. *See*

*Hung Cavalieri v. Avior Airlines C.A.*, No. 19-11330, 25 F.4th 843, 2022 U.S. App. LEXIS 3184, at

\*19-21 (11th Cir. 2022) (because the airline ticket was incorporated in the CoC and did not disclose

the extra fees charged by airline, the motion to dismiss the breach of contract claims was denied).

### C.   CONFUSING AND CONTRADICTORY STATEMENTS IN AA'S E-TICKET EMAILS DO NOT RENDER THEM UNENFORCEABLE

AA argues that the E-Ticket Emails do not *really* promise free checked bags because they

contain the language "no free checked bags" in addition to "1ST CHECKED BAG FEE-[route]-

USD0.00", rendering the emails "at best – confusing[.]" AA SJ Br. at 32. This argument fails for

four reasons. <u>First</u>, the unambiguous price term of "USD0.00" for the first and/or second bag

constitutes a firm commitment to transport such bag at that price. This exact number is more

precise than "no free," and for that reason supercedes "no free." <u>Second</u>, it is standard AA business

practice to honor that USD0.00 promise according to its terms. According to AA's Rule

30(b)(6) witness, it is AA "policy" to honor that free bag promise (at least if a customer notices,

7

shows the email with the USD0.00 promise, and complains). *See* Plfs. SJ App'x 392  (AA 30(b)(6)

testimony at 58:21-59:2). Having admitted that this is standard practice, AA cannot disavow that

practice only in litigation.  Third, to the extent that the terms contradict each other or otherwise

ambiguous, "ambiguities in a contract are to be construed against the drafting party." *Stellar*

*Restoration Servs. v. Courtney*, 533 F. Supp. 3d 394, 407 (E.D. Tex. 2021); *see also Bexar C'nty Hosp. Dist.*

*v. Factory Mut. Ins. Co.*, 475 F.3d 274, 277 (5th Cir. 2007) (citing *Gonzalez v. Mission Amer. Ins. Co.*, 795

S.W.2d 734, 737 (Tex. 1990)).[5]  Finally, the last sentence of AA's E-Ticket Emails states that

"additional allowances and/or discounts may apply," *see* AA SJ App'x 240, supporting the Email

Class members' claims to apply the most favorable statement in the E-Ticket Emails.

### D. FEDERAL REGULATIONS REQUIRE AA TO SEND PERSONALIZED CONFIRMATION OF BAGGAGE FEES FOR EACH TICKET

AA would like this Court to believe that baggage fees promised in the E-Ticket Emails are

unenforceable, gratuitous statements by AA.   But federal regulations require AA to send customers

an e-ticket confirmation setting forth the price for all first and second checked bags:

> (c) On **all e-ticket confirmations for air transportation** within, to or from the
> United States, including the summary page at the completion of an online purchase
> and a post-purchase email confirmation, **a U.S. carrier**, a foreign air carrier, an agent
> of either, or a ticket agent that advertises or sells air transportation in the United
> States **must include information regarding the passenger's free baggage
> allowance and/or the applicable fee for a carry-on bag and the first and
> second checked bag**.  **Carriers must provide this information in text form in
> the e-ticket confirmation.** Agents may provide this information in text form in the
> e-ticket confirmations or through a hyperlink to the specific location on airline
> websites or their own website where this information is displayed. **The fee
> information provided for a carry-on bag and the first and second checked bag**

---

[5] AA does not tell the Court why its E-Ticket Emails routinely stated both "no free checked bags" and also promised a price of USD0.00 for the first and/or second checked bag.  AA's deponents could not (or would not) say, either.  But in examining a large number of AA E-ticket Emails, Plaintiffs noticed that every time a passenger is on a route and class of service that ordinarily offers no free checked bags (*e.g.* domestic coach), but the passenger is entitled to a free bag based on a credit card or elite status or both, AA *always* says "no free checked bag" and USD0.00.  Perhaps the "no free" language comes from route and class of service, while the USD0.00 comes from those factors plus credit card and/or elite status.  Regardless, AA is bound by its most generous promise.

**must be expressed as specific charges** taking into account any factors (*e.g.*, frequent flyer status, early purchase, and so forth) that affect those charges.

14 C.F.R. §399.85(c) (emphasis added). AA sends E-Ticket Emails to comply with that requirement:

> Q.  Okay. The last one is the E-ticket confirmation email.  Does that set forth the baggage fees applicable to a passenger?
> A.  Yes, it does.

Plfs. SJ App'x 403 (AA 30(b)(6) testimony at 102:24-103:2); *see also id.* at 406 (115:25-116:3 ("every" E-Ticket email contain baggage fee information); *Id.* at 403 (104:17-26) ("A. … The E-ticket confirmation is an email that is generated by the booking transaction to show the fees -- the baggage fees that you will be charged once you get to check-in, and the baggage fees come from Sabre."). Furthermore, once AA communicates baggage fees to customers, it may not increase those fees.[6]

When AA charges higher fees then it represents in E-Ticket Email, it not only breaches its contract with class members but also violates federal regulations. Any other result renders the federal baggage disclosure requirements optional, and is antithetical to the meeting of the minds fundamental to a contract.

## E.    AA DID NOT MAKE A "MISTAKE" OR "ERROR" IN THE E-TICKET EMAILS

AA tries to downplay its contractual representations in E-Ticket Emails by calling its statements of free bag benefits "mistake[s]" or "error[s]."  But if AA's statements were a mistakes or errors, those errors were neither apparent to nor attributable to Email Class members. Ultimately, whether AA made a mistake is irrelevant because the mistake, if it was one, was unilateral by AA.  It is black letter law that a unilateral mistake does not change the terms of an agreement.  *See Salinas v. McDavid Hous.-Niss, L.L.C.*, 831 F. App'x 692, 696 (5th Cir. 2020) ("'Under Texas law, a unilateral

---

[6] Increasing baggage fees after communicating the price in the E-Ticket Email is not only a breach of contract, but also specifically prohibited by 14 C.F.R. §399.88(a).  When another airline increased baggage fees after an agreed price was communicated to its customers, DOT deried the practice as an unlawful "bait and switch."  *See Spirit Airlines, Inc. v. United States DOT*, 687 F.3d 403, 417 (D.C. Cir. 2012) ("But DOT saw this as a classic bait and switch. It found that when consumers purchase airline tickets, they assume that the price they pay for extra bags at the airport will be the price advertised when they bought their ticket.").

mistake is generally insufficient to warrant setting aside a contract unless the mistake is induced by acts of the other party.'") (quoting *Lagniappe Lighting, Inc. v. Bevolo Gas & Elec. Lights, Inc.*, No. H-11-4538, 2013 U.S. Dist. LEXIS 101777, at *28 (S.D. Tex. July 22, 2013) (citations to Texas decisions omitted); *Wentwood Woodside I, IL v. GMAC Commercial Mortgage Corp.*, 419 F.3d 310, 316 (5th Cir. 2005) (under Texas law, the unilaterally mistaken party alone bears responsibility for its error).

Furthermore, AA fails to even show the E-Ticket Emails contain a "mistake" or "error." AA's claim of "mistake" follows from its view that if the baggage fees in E-Ticket Emails contradict the baggage fees in the CBP, the CBP must be correct and the E-Ticket Emails incorrect.  There are at least five fatal problems with AA's reasoning.  <u>First</u>, the CoC incorporates the E-Ticket Emails into the contract as the "ticket," and the E-Ticket Emails are therefore contractually enforceable. *See supra* Sec. III(A).  <u>Second</u>, the E-Ticket Emails were created later in time than the CBP, superseding any contradictory language in the CBP.  <u>Third</u>, whereas the CBP includes generalized terms and language, the E-Ticket Emails are sent directly by AA to its customers, and tailored to each customer's individual travel situation (which route, what elite status, what credit card, etc.). Being more specific, the E-ticket Emails should supersede.[7]  <u>Fourth</u>, as enumerated in Sections V(E)(1)&(2) below, AA routinely promises free bags for a host of reasons not set forth in its CBP. It is no surprise for a passenger to be entitled to a baggage benefit not written in CBP.  <u>Fifth</u>, any condatiction between the E-Ticket Emails and the CBP should construed against the drafter, AA.

If AA actually considered the baggage fees represented in those E-Ticket Emails to be *bona fide* "errors," AA would have invoked the term in its CoC dealing with "Erroneous fares," which provides a specific mechanism and strict timetable on which AA may correct such errors. *See* AA SJ App'x. 7-8 (CoC); *accord* AA SJ App'x. 234-5, CoC (2/18/19) (same). AA does <u>not</u> argue that it

---

[7] The Court should not endorse AA's argument that the personalized emails it sends to class members regarding baggage fees should be trumped by the CBP, a lengthy document buried on AA's website.

voided any Email Class member's ticket based on errant baggage fees contained in the fares represented in the E-Ticket Emails.  Far from complying with the timetable in AA's "Erroneous fares" provision of CoC, the record indicates that AA knew sometimes for months or longer of the problems it now calls "an error or 'glitch' in American's computer systems."  AA's Summary Judgment brief ("AA SJ Br.") at 23, n.10. For example, AA's own "Defect Report" identifies a defect that resulted in promises of free bags in E-Ticket Emails that persisted for months while AA continued to send out the confirmation emails. *See* Plfs. SJ App'x 715-7; *see also* Plfs. SJ App'x 394 (AA 30(b)(6) testimony at 66:4-67:3) (one such "bug" listed on a Defect Report lasted for over 2 months); *id.* at 407-8, 419-20 (120:22-122:19, 167:21-170:17) (another known computer problem caused free bag promises in E-Ticket Emails for at least 3 months in 2017); *id.* at 383, 402-3 (22:7-24:11, 97:17-101:24) (conceding that AA has known about E-Ticket Email promises of free second bags on transatlantic flights since 2021 – but still charges for those bags and has done nothing to stop making those E-Ticket Email representations). With AA not having followed its own procedures for correcting errors, neither in substance nor in timing, AA's representations of free baggage fees confirmed in the E-Ticket Emails cannot be considered mistakes or errors.

AA loads its baggage charges into the computer system that tracks fares, and then AA sends individualized E-Ticket Emails to passengers memorializing those charges.  Why is the customer bound by the CBP rather than the individualized, federally-mandated E-Ticket Email that is specific to the passenger's individual travel?  This, at a minimum, is a question for a jury.

### F.   EQUITABLE REFORMATION IS NOT AVAILABLE TO EXCUSE AA'S BREACH

#### 1.   AA Waived its Equitable Reformation Defense

AA waived its equitable "contractual reformation" defense by not pleading it in its Answer. Dkt. 25. That Answer pled fourteen affirmative defenses, none of which pled the contractual reformation defense raised AA in AA's summary judgment motion.  *See id.* at 22-25.  FED. R. CIV. P.

11

8(c) requires a party to plead all affirmative defenses in its answer. The list of affirmative defenses within Rule 8(c)(1) "is not exhaustive." *Sun River Energy, Inc. v. McMillan*, No. 13-cv-2456-D, 2014 U.S. Dist. LEXIS 135086, at *9 (N.D. Tex. Sep. 25, 2014). The failure to plead an affirmative defense results in the waiver of that defense. *Id.; see also Oden v. Oktibbeha Cty.*, 246 F.3d 458, 467 (5th Cir. 2001); *Ingraham v. United States*, 808 F.2d 1075, 1079 (5th Cir. 1987).

### 2. AA Did Not Make a *Bona Fide* Mistake, and has Unclean Hands, which Prevents Equitable Reformation

AA asks to be absolved of liability as a matter of equity for emails that AA claims falsely promised free checked bags because, AA claims, it made a mistake. AA SJ Br. at 25. AA certainly didn't act like it had made a mistake.  AA was aware that AA was sending emails with promises of free checked bags that AA claims were erroneous, yet AA chose not to fix any supposed "errors." At the very least, the *Bazerman* lawsuit put AA on alert, at the highest levels, that its E-Ticket Email systems were, to put it politely, unreliable—and hence were in need of significant engineering rework in order to avoid promising free bags to yet other passengers who, under other AA policies, were arguably not supposed to get free bags.  But far from redesigning those systems, AA let the problems linger.  Allowing this mess rather than actually and promptly fixing the problems once and for all, AA effectively ratified the promises in the emails AA knew it was sending, and it pocketed baggage fees it promised not to charge.  It certainly wasn't a mistake as far as AA's bottom line is concerned. It only became a mistake when AA was caught.

It is a central tenet of equity that in order to receive equity, one must do equity. "[T]he doctrine of 'unclean hands' allows a court to 'refuse to grant equitable relief ... sought by one whose conduct in connection with the same matter or transaction has ... violated the principles of equity and righteous dealing.'"  *Binh Hoa Le v. Exeter Fin. Corp.,* 990 F.3d 410, 416 (5th Cir. 2021) (modifications and ellipsis in original) (quoting *Stewart Beach Condo. Homeowners Ass'n, Inc. v. Gili N*

*Prop Invs., LLC*, 481 S.W.3d 336, 351 (Tex. App.—Houston [1st Dist.] 2015) quoting *Park v. Escalera Ranch Owners' Ass'n, Inc.*, 457 S.W.3d 571, 597 (Tex. App.—Austin 2015)); *accord Bagby Elevator Co. v. Schindler Elevator Corp.*, 609 F.3d 768, 774 (5th Cir. 2010) ("Under Texas law, '[t]he clean hands doctrine requires that one who seeks equity, does equity.'") (quoting *Dunnagan v. Watson*, 204 S.W.3d 30, 41 (Tex. App. 2006)); *Powell, Inc. v. Abney*, 669 F.2d 348, 350 (5th Cir. 1982) ("Texas recognizes the equitable maxim that one who enters the court seeking equity must come with clean hands.") (citing *City of Wink v. Griffin Amusement Co.*, 100 S.W.2d 695, 702 (Tex. 1937)).[8]

AA has unclean hands. First, AA is responsible for failing to preserve evidence relevant to this defense. For example, AA had the ability to store baggage fee information in its data warehouse system but simply chose not to. *See* Plfs. SJ App'x 412 (AA 30(b)(6) testimony at 137:24-138:10); *see also id.* at 413 (143:24-144:7) ████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████ Even after this case was filed, AA continued to "purge" confirmation emails that it knew where central to the claims in this action. According to its Rule 30(b)(6) witness, it has continued to "purge" those documents after a few "days." *See* Plfs. SJ App'x 759 (AA 30(b)(6) testimony at 34:18-23) ██████████████████████
████████████████████████████████████████████████████████████
███████████████████████████████████[9]

AA's failure to maintain key evidence in this case is nothing short of remarkable: Though E-tickets themselves are stored, E-Ticket Emails cannot be recreated because AA does not maintain

---

[8] AA's CoC adopts Texas law for state law claims. *See* AA SJ App'x. 24, CoC (3/18/17).
[9] AA and Plaintifs have attempted to reconstruct these records from multiple sources, but this is fundamentally a problem of AA's own creation. E-Ticket Emails are the core of AA's contract with passengers, yet inexplicably AA did not keep copies.

one particulat part of the E-Tickets: "price quotes on bags." Plfs. SJ App'x 411 (AA 30(b)(6) testimony at 136:1-25). AA purposefully did not update its storage system to include baggage fee information. *Id.* at 412 (138:6-14). As a result, AA has neither records of the promises made to Email Class members regarding free checked bags, nor records of the price quotes in the E-Tickets that, AA claims, would show "mistakes". *Id.* at 413 (143:21-144:7). AA did not change its system to maintain this information after it was sued in *Bazerman*. And it did not begin to save this critical, indisputably relevant information in this action. Plfs. SJ App'x 759 (AA 30(b)(6) testimony at 34:5-23).

Second, AA does not argue that, when it learned of such "mistakes", AA tried to fix them, or mitigate their damage, or upgrade its defective computer system, or attempted to figure out which customers were affected, or send follow-up emails prior to the anticipated travel correcting mistakes. Instead, AA merely argues when an E-Ticket Email promises a free checked bag where the CoC or CBP do not, the E-Ticket Email is mistaken (despite the three documents all being part of the contract.) AA SJ Br. at 26. Indeed, AA *cannot* claim that it took any remedial action, because, as discussed *infra* Sec. III(F)(2), AA's response when it learned that their customers are being erroneously charged for checked bags was to pocket the money, delete relevant documents, and hide behind a defective class waiver. While AA's spoliation of evidence in this case is probably sufficient to deny summary judgment, it most certainly is sufficient to find that AA has unclean hands and is not entitled to equitable reformation. *See De Los Santos v. Kroger Texas, LP*, 2015 WL 3504878, at *4 n.2 (N.D. Tex. June 3, 2015) ("If a court concludes an adverse inference instruction is warranted, then it can deny summary judgment because the adverse inference provides a genuine issue of material fact for a jury to consider.").

Third, AA has not been forthcoming about the extent of these "mistake" overcharges in this litigation.  When first asked, AA only admitted to a single round of problems (*i.e.*, a single "glitch",

and that supposedly fully resolved and released in the *Bazerman* litigation). Plfs. SJ App'x 401 (AA 30(b)(6) testimony at 94:14-19). Plaintiffs pressed AA with examples of other glitches, including after *Bazerman* and in other circumstances, and only then and with the benefit of Motion to Compel rulings did AA finally produce its longstanding business records about other "glitches." *See, e.g.*, Plfs. SJ App'x 527-8 (AA 30(b)(6) testimony at 44:16-45:4). *See also*, *id.* 708-18; Plfs. Decl. ¶19. In attempting to conceal the other glitches, AA forfeited any possible equitable reformation.

Fourth, discovery has proven not just that AA knows that it charged customers for baggage that E-Ticket Emails confirmed would be free, but that AA has done nothing either to alert or to refund such customers. AA always had the ability to identify the members of the email Class who were overcharged, and thereafter provide refunds. We know that because AA used its records to identify over appoximatlly 1.4 million members of the Email Class to receive notice of this Court's class certification order. *See* Plfs. SJ App'x 3 (Giskan Decl. ¶21). Nonetheless, even when AA realized its systems had promised free bags to passengers AA actually intended would pay, AA did not send corrective notice to those passengers. And even though AA knows which customers it both promised a free bag and charged for that bag, AA did not take steps to refund all such customers. Quite the contrary, only if those Class members complained to AA's customer service department did AA even consider providing refunds:



Plfs. SJ App'x 435 (28:7-29:19) (emphasis added); *see also* Plfs. SJ App'x 743-4 (AA 30(b)(6) testimony at 18:18-19) (AA will only consider a refund if customer complains and produces the E-Ticket Email to AA's customer servicer department).

One example of AA's insufficient response to learning about baggage fee issues concerns Defect 21657. By July 22, 2019, AA had marked Defect 21657, which relates to promises of free

bags, as high priority. Plfs. SJ App'x 716. Months later, on September 19, 2019, ███████████ in

AA emailed that the defect ███████████████████████████████████████████████████████

██████████████████████████████████████████████████ *Id.* at 877. This

despite ████████████ saying on July 30, 2019, that handling this defect was ████████

responsibility. *Id.* at 879. The record contains no indication that, in the months after AA

acknowledged this defect, it took any measures to alert its customers or mitigate its damage. It is an

inequitable practice for AA to know that it charged members of Email Class for baggage AA

promised would be free, and neither contact affected passengers to admit the problem.

AA is also not entitled to equitable relief because it had a legal remedy at its disposal, which

it waived.  AA's CoC gave it the right to "void" a fare issued in error.  *See* AA SJ App'x 7-8. [10] AA

knew about its many computer "glitches"—often for years—resulting in E-Ticket Emails

confirming the price of baggage that AA now (self-servingly) calls a "mistake."  But AA did not avail

itself to its contractual ability to void erroneous fares.  With an available remedy at law, AA cannot

seek an equitable remedy.  *See Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 881, n.50

(5th Cir. 2019); *Google, Inc. v. Hood*, 822 F.3d 212, 222 (5th Cir. 2016).

## IV.   AA'S LIMITED CLASS ACTION WAIVER CLAUSES DO NOT SUPPORT ANY DISMISSAL

AA seeks partial immunity for its breaches based on class action waiver clauses that AA

added to the CoC and Site Usage Policy in 2020 and 2015, respectively.  AA's arguments fail as to

both groups due to the plain language of the clauses at issue as well as their defective presentation.

---

[10] Notably, that term of the CoC provides AA with the ability to void errant fares within 12 hours of
learning of the fare, without any mention of that knowledge being obtained before or after travel.
Regardless, AA knew about many of the so-called computer "glitches" before many passengers
completed their travel.

## A.   THE CLAUSE ADDED TO THE CoC IN APRIL 2020 DOES NOT SUPPORT DISMISSAL OF THE PLAINTIFFS' CLAIMS OR ANY CLASS MEMBERS' CLAIMS

AA first argues that the Court should dismiss the claims of class members who purchased tickets on or after April 8, 2020, the date AA posted a revised CoC that added a clause stating: "any lawsuit you bring against us ... will be brought only in your individual capacity, and may not be brought in or asserted as part of a class action proceeding."  AA SJ App'x 288, 355.  By its own terms, this clause only purports to apply to a passenger with respect to a "*lawsuit you bring against*" AA and its affiliates, and the clause specifically does not apply to any absent class members, none of whom **brought a lawsuit** here.  *See Day v. Persels & Assocs., LLC*, 729 F.3d 1309, 1317 (11th Cir. 2013) (A class action "is not brought 'by or against' absent class members.").

In sharp contrast to AA's narrow provision, AA cites cases in which class waivers went importantly further and by their terms additionally prohibited being *part* of a class action (*i.e.*, as an absent class member).  For example, the clause at issue in *Convergys Corp. v. Nat'l Lab. Rels. Bd.*, 866 F.3d 635, 636 (5th Cir. 2017), stated that employees would not "lead, join, or *serve as a member of a class or group* of persons bringing such a claim or lawsuit." (emphasis added).  Likewise, the clause in *Ranzy v. Extra Cash of Texas, Inc.*, No. H-09-3334, 2011 WL 13257274, at *4 (S.D. Tex. Oct. 14, 2011) stated "you are waiving your right to serve as a representative … and/or *participate as a member of class of claimants, in any lawsuit filed against us* …." (emphasis added). In *Roman v. Spirit Airlines, Inc.*, 2021 WL 4317318, at *1 (11th Cir. Sept. 23, 2021), the clause applied broadly to "any case *brought*" (*compare* Def. App; at 355 ("any lawsuit *you bring*")) and specifically prohibited being "a plaintiff *or class member in any purported class or representative proceeding*" (emphasis added).[11] Far from supporting AA's argument, those cases underscore the inapplicability

---

[11] *Roman* is distinguishable on the additional ground that the clause there existed when the named plaintiffs conducted their transactions at issue, *Roman*, 2021 WL 4317318, at *1, and thus the court had no occasion to consider the clause's applicability to absent class members (because dismissal of

of AA's narrower clause to the class members here.  If AA had wanted to ban being an absent class member, AA was the drafter of its CoC and could have looked to any of these exemplars for language that would accomplish what AA now claims was its intent.[12]

Nor can AA credibly argue that the customers who **did** bring this lawsuit—the named Plaintiffs—are subject to this clause, because their claims concern travel and baggage charges that occurred years before AA added this clause to the CoC (Complaint, ¶¶ 13-16, Docket No. 1); AA SJ App'x 409 (Ghosh Decl. ¶¶ 5-6)).  The named Plaintiffs thus are governed by the then-existing CoCs (which did not have the clause) and other contemporaneous terms applicable to those transactions.  *See* AA SJ Br. at 10 & n.7 (AA explaining that the iteration of the CoC in place "at the time of [Plaintiff's] transaction" govern); AA SJ App'x 354-355 (CoCs apply to consumers in their role as passenger for the instance of travel); *see also* 14 C.F.R. § 253.9 ("An air carrier may not retroactively apply to persons who have already bought a ticket any material amendment to its contract of carriage that has significant negative implications for consumers.").[13]  Indeed, AA does not even try to argue that Plaintiffs' claims are subject to the CoC waiver clause.  *See* AA SJ Br. at 39 (argument as to Plaintiffs premised only on Site Usage Policy clause and Plaintiffs having supposedly agreed to same because they "logged into aa.com").

## B.   AA's DEFECTIVE CONTRACT FORMATION PROCESS RENDERS ITS CLASS WAIVER UNENFORCEABLE

Moreover, this clause would be unenforceable in any event because it was never adequately disclosed.  Since AA first slipped this clause into the CoC in 2020, it has always been, to put it

---

the plaintiffs' claims ended the case).  Here, as discussed below, the April 2020 CoC clause cannot apply to Plaintiffs, whose claims concern travel/charges from before that clause even existed.

[12] The clause's inapplicability to absent Class members is clear.  But again, any ambiguity must be "construed strictly against" drafter AA.  *Bexar County,* 475 F.3d at 277.

[13] For the same reason, even if this clause did apply to absent Class members and was enforceable, AA's argument would still fail as to Class members' travel and charges pre-dating the April 2020 revised CoC adding the new clause, whether or not they have more recent travel that is subject to the revised CoC.

generously, buried.  Although AA's declarant states that AA's exhibits are "true and correct" copies of the 2020 CoC (AA SJ App'x  287, 354; *id.* at 4 (Lessin Decl. ¶¶ 21, 25)), regrettably these CoCs are not correct because they do ***not*** accurately reflect what consumers see on their screen upon loading the CoC in a standard web browser.

The  current  CoC,  ***as  actually  presented  to  consumers***,  is  at: https://www.aa.com/i18n/customer-service/support/conditions-of-carriage.jsp.[14]   As  the  Court can readily confirm by opening that page in a web browser, that page shows a modest 547 words of text, less than one tenth of the 6,559 word behemoth AA presents in their Exhibits T and X.  Only if the consumer knows to, and does, click on fifteen separate expandable headings on the page would the consumer actually see all the text that AA's exhibits show.[15]   Notably, the limited text actually presented to the consumer, without the lengthy process required to get the document to the form shown in AA Exhibits T and X, does ***not*** include the class waiver clause.  Nor do any of the expandable headings suggest there is a class waiver hidden within.[16]

Tellingly, AA cites no authority supporting that its approach constitutes adequate disclosure. Plaintiffs have never seen a document that conceals a class waiver behind an expandable section heading, not to mention within a document with ***fifteen*** expandable headings.  Plaintiffs submit that AA's approach falls well short of Texas standards, rendering the clause unenforceable even if it did otherwise apply (which it does not).  *See In re Capco Energy, Inc.*, 669 F.3d 274, 279-80 (5th Cir. 2012); *Omni USA, Inc. v. Parker-Hannifin Corp.*, 798 F. Supp. 2d 831, 850 (S.D. Tex. 2011) (contract term

---

[14] *See also* AA SJ App'x 396-98 (Noda Decl., ¶¶ 6-7) (no changes since clause was added in 2020).
[15] In fact, yet greater effort is actually required to unwrap the full CoC text. Each click of a heading pushes the remainder of the CoC down and renders less prominent the other headings yet to be clicked, making it even less likely a consumer will ever see all of the text.
[16] To see how arduous and confusing it is to wade through the CBP, see the video attached as Exhibit 16 (Plfs. SJ App'x 885).

sufficiently conspicuous if "it is written so that a reasonable person against whom it is to operate should have noticed it.").

### C.   THE LIMITED WAIVER CLAUSE IN AA'S SITE USAGE POLICY DOES NOT SUPPORT DISMISSAL OF PLAINTIFFS' OR ANY CLASS MEMBERS' CLAIMS

AA next argues for dismissal of Class members who are AAdvantage members and purchased tickets on or after May 5, 2015.  This argument, too, fails due to both the substance of the contract provision at issue, as well as even more outrageous contract formation.

First, AA relies on a clause that simply does not apply to the claims in this case.  The crux of AA's argument is that "as part of signing up for…AAdvantage," this group of class members should be deemed to have agreed to a separate document entitled the "Site Usage Policy" ("SUP") (AA SJ Br. at 36) and should be bound by a class waiver in the SUP.  But the SUP is a narrowly-focused set of terms that governs (or purports to govern) the rights and responsibilities of AA and visitors regarding the AA website and Mobile App (collectively, the "Site").  By its own terms, the SUP does **not** purport to govern the relationship between AA and the customer more broadly.[17]  Consistent with the true scope of SUP, the class waiver within SUP is expressly limited in scope, stating that it covers claims "***related to your access to, dealings with, or use of the Site***." AA SJ App'x 382 (emphasis added). Under Texas law, "[i]f [a contract] is worded so that it can be given a definite or certain legal meaning, it is not ambiguous and [the court will] construe it as a matter of law." *Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 157 (Tex. 2003).  The claims in this case are plainly not

---

[17] For example, the SUP covers things like establishing that information on the Site is AA's intellectual property; rules about visitors' use of Site communication spaces like bulletin boards and chat rooms; and information about accessing services on the Site. The SUP's focused terms purport to apply "[i]n return for [the visitor] gaining access to the Site and using it."  AA SJ App'x 375-382. One might ask, then, why the *AAdvantage Terms and Conditions* even reference the SUP. There is a good answer:  The *AAdvantage Terms* appropriate discuss the ways customers can redeem their AAdvantage miles to claim travel benefits—including, as the *Terms* explain, using aa.com to book travel.  The *AAdvantage Terms* appropriately indicate that a customer who uses aa.com to redeem travel is properly bound by SUP to the extent of that use of aa.com.  Obviously none of this has anything to do without bag fees, bag fee overcharges, or class waivers for such disputes.

about the Site.  Rather, the claims in this case arise out of AA's practice of charging class members

for baggage fees when they check in at the airport, in breach of their contracts with AA.  The SUP

does not cover AA's airport charges, and the Court should reject AA's overreach.

Even if the clause's scope were deemed at all ambiguous, the clause must be "construed

strictly against" drafter AA.  *Bexar County*, 475 F.3d at 277; *Hunt v. CheapCaribbean.com, Inc*, No. 3:09-

CV-0622-K, 2009 WL 10704881, at *4 (N.D. Tex. June 23, 2009) (this is "particularly true in an

adhesion contract"); *see also id.* (rejecting defendant's effort to invoke venue clause in its website

terms of use; the clause applied to "all disputes arising out of or relating to the use of this website,"

but  did not "specifically include any mention of travel"; court construed clause in plaintiffs' favor,

finding plaintiffs "could reasonably have expected it to be limited to claims related directly to the

operation of the website rather than the underlying travel service").

<u>Second</u>, this clause would be unenforceable anyway because it was not adequately disclosed

(to put it generously).  Under Texas law, a contract will be enforced only to the extent a party "had

reasonable notice of the existence of its terms, *i.e.*, where the notice was reasonably conspicuous."

*Walker*, 2020 WL 703268, at *2.  While courts often enforce so-called "click wrap" agreements, the

terms must be "reasonably conspicuous" to be enforceable.   *Hunt*, 2009 WL 10704881 at *3

("Reasonably conspicuous notice of the existence of contract terms and unambiguous manifestation

of assent to those terms by consumers are essential if electronic bargaining is to have integrity and

credibility."). A term is conspicuous if "it is written so that a reasonable person against whom it is to

operate should have noticed it." *Omni USA,* 798 F. Supp. 2d at 850; *see also Fieldtech Avionics &*

*Instruments, Inc. v. Component Control.Com, Inc.*, 262 S.W.3d 813, 829 (Tex. App. 2008) (term "not

conspicuous as a matter of law" where it "appeared on the third page of the five-page clickwrap

agreement" and was "not in larger type or other contrasting font or color.").

The deficient disclosure of the SUP and its class waiver is particularly egregious. AA wishes to bind certain customers to a clause in its SUP by virtue of the fact that those customers at some time signed up for AAdvantage. AA SJ Br. at 38. But AA does not tell the Court about the long and unlikely journey required for a customer, signing up for AAdvantage, to even have a chance of seeing the waiver clause in the SUP. By Plaintiffs' count, this journey has at least four steps, each less likely than the last:

- First, when the user signs up for AAdvantage, AA shows a box: "I agree to the AAdvantage terms/conditions."[18] The user must agree (i.e., click-wrap), but is not required to actually click through to see the terms and conditions before doing so. AA SJ App'x 410, 415 (Ghosh Decl, ¶¶ 7-8, Ex. 1). Rare is the consumer who actually clicks through.

- Second, even if the user clicks the AAdvantage terms/conditions link, the user must find the SUP link inside the resulting document. This is no small feat due to the same expandable heading problem discussed in the prior section as to COC. Here again, AA's exhibits are misleading. Far from "true and correct" (AA SJ App'x 4 (Lessin Decl. ¶ 27), 385, 410 (Ghosh Decl. ¶ 8), 418), AA's exhibits show the AAdvantage Terms and Conditions page with its six expandable headings already expanded, enlarging the document from a modest 392 words to fully 5,948 words. In particular, AA's exhibits indicate that all of the text shown in the exhibits are presented to the consumer, when in fact a user opening this page actually sees less than one fifteenth of the text AA presents in its exhibits.[19] Notably, nothing in the text actually shown in the standard AAdvantage Terms and Conditions page even mentions the SUP, not to mention a class waiver. The user would need to click to expand each section heading—including the additional searching discussed in footnote 15.

- Even with the terms and conditions fully expanded, AA makes it unusually difficult to find the link to AA's Site Usage Policy. Within the expandable heading "Redeeming AAdvantage miles" (a heading which by its terms offers zero indication that it leads to a Site Usage Policy, not to mention a class waiver), the user will find a list of *17 bullet points* totaling 849 words. Squarely in the middle, the *seventh* bullet states in its final sentence: "By accessing your AAdvantage account on aa.com, you agree to the aa.com site usage policy." This is the first and only mention at all of the SUP. But even having found this sentence and this reference to SUP, can the user in fact reach the SUP? One might expect the words "site usage policy" to be a hyperlink, the standard way for one web page to point to another, but AA did no such thing; the "words "Site Usage Policy" are ordinary words, not a clickable link. Inexplicably, AA places the link to SUP *outside* the bulleted list, and captions it not "site usage policy" (the name of the document the user has purportedly just agreed to be bound by) but rather "Legal information." Worse yet, the placement of the language "Legal information" on a separate line suggests to the reader that it is

---

[18] These terms are different from the SUP and notably do **not** include a class waiver.

[19] The current AAdvanage *Terms and Conditions*—as actually presented to vistitors—are here: https://www.aa.com/i18n/aadvantage-program/aadvantage-terms-and-conditions.jsp

a heading for the remaining 10 bullet points under same. See fn [citing the AAdvantage Terms and conditions]. This is highly irregular; throughout aa.com and of course across the web, standard practice is to make the name of a referenced document a clickable link. And nothing about "Legal information" fairly alerts the reader that this is the way to reach the SUP.

- If an especially inquisitive user somehow clicks the "Legal information" hyperlink, the user finally reaches the SUP and its 3706 words of dense legal text. In the final sentence of the thirteenth section, 90% of the way through the document, the user might finally find the class waiver that AA seeks to invoke. Though even within the document, this clause is easily overlooked—not given in its own section in the document, nor called out in any manner (e.g., bold text), nor even referenced in the title of the subsection in which it is buried. AA SJ App'x 382.

Far from "reasonably conspicuous," this is a case study in how **not** to disclose a contract term to a customer. This clause is nowhere close to satisfying Texas law standards for reasonably conspicuous disclosure, and is thus it is unenforceable even if it did apply to the subject matter of the claims here (it does not).[20]

    Third, this clause could not apply in any event to Class members who signed up for AAdvantage before AA added the clause to the SUP in 2015. The named Plaintiffs both signed up for AAdvantage years **before** AA added the clause at issue. See AA SJ App'x 409-411 (Ghosh Decl., ¶¶ 4-6)). Even on AA's theory, the fact that these customers signed up before the clause existed undermines AA's basis for imposing the clause. See AA SJ Br. at 37 (AA arguing Court should

---

[20] AA's reliance on *Zamber* is misplaced. The Florida court there did not give proper consideration to the practical steps required to see the forum selection clause at issue. *Zamber v. Am. Airlines, Inc.*, No. 16-23901-CV-MARTINEZ/GOODMAN, 2020 WL 1445479, at *3 (S.D. Fla. Feb. 11, 2020). This Court should reject AA's mischaracterizations of, and AA's attempt to ignore, what is actually shown and not shown to consumers and the unlikely path and exceptional effort required for a consumer to see the waiver clause here. AA also falsely implies that this Court endorsed the Florida court's reasoning in *Zamber*. In fact, this Court, following Fifth Circuit law regarding the extremely limited circumstances where transfer orders should be reviewed by the transferee court, expressly limited its review to whether "unanticipatable post-transfer events frustrate[d] the original purpose for transfer" or the transfer order was "manifestly erroneous." *Zamber v. Am. Airlines, Inc.*, No. 4:20-cv-00114-O, 2020 WL 3163037, at *5 (N.D. Tex. June 11, 2020) (also noting plaintiff did not address the Florida court's other, independent basis for transfer (public and private interest factors)). Furthermore, the *Zamber* plaintiffs did not dispute the substantive coverage of SUP to their dispute. At issue in *Zamber* were AA's allegedly-improper methods of selling insurance on AA.COM. Whether the claim in *that* case was arguably properly within the SUP's scope (though the court never addressed that in *Zamber*), the claims here are plainly outside the scope of the SUP in that they concern bag charges made at the airport not on the Site.

dismiss "AAdvantage members who purchased tickets on or after May 5, 2015, who agreed *as part of signing up for the AAdvantage frequent flier program* to waive their right to bring a class action), 38 (AA's argument premised on agreement at AAdvantage sign up).

AA apparently realized its theory cannot apply to customers who had signed up before 2015, including Plaintiffs, and so (at least for Plaintiffs) AA subtly pivots to an alternative theory: that Plaintiffs should be deemed to have agreed to this hidden clause, not when they signed up for AAdvantage (when the clause didn't even exist), but because they "logged into aa.com" as they booked the travel at issue. AA SJ Br. at 38. AA's declarant explains that through "certain access points" to aa.com, AA tells customers they are agreeing to the *AAdvantage Terms and Conditions* when they log in.  AA's declarant further opines, with limited confidence, that "it appears" Plaintiffs "would have been presented" that language when they logged in. AA SJ App'x 441 (Jarrell Decl., ¶¶ 3-5). AA's alternative "log in" theory, for sticking Plaintiffs and other customers with the SUP class waiver, is even weaker than its AAdvantage sign up theory.  For one, AA's login theory requires the same long, unlikely contract formation path discussed above.  Second, the start of the login theory contract formation path does not even require the customer to check a box agreeing to anything at the start.  This practice is termed "browsewrap" (as opposed to "clickwrap" when a customer clicks their acceptance to agreement set forth on the website), and is not generally enforceable in these circumstances. *See Sw. Airlines Co. v. BoardFirst, L.L.C.,* No. 06-cv-0891-B, 2007 U.S. Dist. LEXIS 96230, at *13-17 (N.D. Tex. Sep. 12, 2007) (citing *Specht v. Netscape Communications Corp.,* 306 F.3d 17 (2d Cir. 2002)).[21] Third, while a user creating a new frequent flier account might expect to be

---

[21] *See also Nguyen v. Barnes & Noble Inc.,* 763 F.3d 1171, 1175-79 (9th Cir. 2014); Allison S. Brehm and Cathy D. Lee, *In this Issue, "Click Here To Accept The Terms of Service,* 31 Comm. Lawyer 4, 4 (Winter 2015) ("Generally, courts have declined to enforce browsewrap agreements because the fundamental element of assent is lacking."); Woodrow Hartzog, *Website Design as Contract,* 60 Am. U. L. Rev. 1635, 1644 (2011) (courts "tend to shy away from enforcing browsewrap agreements that require no outward manifestation of assent").

agreeing to a contract (relating to the frequent flyer program), consumers are particularly unlikely to expect that the mere act of logging into an existing account could estrablish new contractual obligations.

Fourth, similar to the class waiver clause in the April 2020 CoC, the SUP clause only purports to restrict customers' ability to "***bring***…any class action lawsuit" against AA.  AA SJ App'x 382.  It does not prohibit being an absent class member in a class action brought by someone else. Thus, even if this clause applied to the subject matter here and even if it were adequately disclosed, it could not apply to absent Class members (*e.g.*, class members who, unlike Plaintiffs, signed up for AAdvantage after the clause came into existence, even assuming subject matter applicability and adequate disclosure).

## V.   AA WAS CONTRACTUALLY OBLIGED TO PROVIDE CREDIT CARD HOLDERS A FIRST CHECKED BAG FREE ON ALL FLIGHTS

AA ubitquotously advertises that holders of its co-branded credit cards will receive their "First Check Bag Free."  AA does not dispute that when members of the Credit Card Class were charged for their first checked bag on domestic flights they were charged incorrectly.  But AA argues that its promise is inapplicable to international flights, although its advertising frequently omits the restriction AA relies on.

### A.   AA DOES NOT DISPUTE THAT CREDIT CARD CLASS MEMBERS WERE ENTITED TO A FREE FIRST CHECKED BAG FOR DOMESTIC FLIGHTS

AA admits that the CBP "explicitly states that customers who have an eligible partner credit card are entitled to a free checked bag on domestic itineraries." AA SJ Br. at 4. Nevertheless, the Credit Card Class includes Class members who were charged for their first checked bag on domestic flights.  AA is not moving for summary judgment of those claims, *Id.* at 11, n.8, except if its "class waiver" argument applies, which is does not. *See supra* Sec. IV. Plaintiff Dr. Ferrigni is among those Class members for his flight from Miami to St. Louis.  Following an overnight layover in Miami, Dr.

Ferrigni checked in the following morning for his Miami to St. Louis flight. On that flight, AA charged him $30 to check his first bag (despite his E-Ticket Email indicating he would not be charged). That was a breach of contract.

Dr. Ferrigni should be permitted to proceed with his claim for breach of contract, on behalf of similarly situated domestic traveling Credit Card Class members. *See* AA SJ App'x 238-41. Dr. Ferrigni's trip involved four flights (two on the outbound and two on the return). His last flight followed an overnight layover in Miami and was wholly domestic, traveling from Miami to St. Louis. *Id.* Dr. Ferrigni should not have been charged to check a bag from Miami to St. Louis. This was a domestic flight, and even AA concedes that cardholders' domestic travel gets a free first bag. Dr. Ferrigni's email confirmation confirms that he should not have been charged for that last leg of his trip:

> Baggage charges for your itinerary will be governed by American Airlines BAG ALLOWANCE -STLSKB-No free checked bags/ American Airlines BAG ALLOWANCE -SKBSTL-No free checked bags/American Airlines 1STCHECKED BAG FEE-STLSKB-USD30.00/ American Airlines /UP TO 50 LB/23KG AND UP TO 62 LINEAR IN/158 LINEAR CM **1STCHECKED BAG FEE-SKBSTL-USD30.00**/American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 2NDCHECKED BAG FEE-STLSKB-USD40.00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM 2NDCHECKED BAG FEE-SKBSTL-USD40.00/ American Airlines /UP TO 50 LB/23 KG AND UP TO 62 LINEAR IN/158 LINEAR CM ADDITIONAL ALLOWANCES AND/OR DISCOUNTS MAY APPLY

*Id.* at 240. The bold portion states that AA should have charged Dr. Ferrigni $30 only once to transport his baggage all the way from SKB (St. Kitts) to STL (St. Louis). Instead, AA charged him $30 *twice*.

AA relegates its argument regarding this claim to a footnote. AA SJ Br. at 14, n. 9. AA there argues that Dr. Ferrigni's flight from Miami to St. Louis was part of his international itinerary, and hence excluded by AA's supposed rule limiting credit card benefits to domestic itineraries. But AA conflates its use of "domestic itinerary" in the CBP, with the separately defined term "domestic

carriage" in the International Tarriff.[22]  The CBP does not define "domestic itinerary," let alone in the context of the credit card baggage benefit that combines both domestic and international flights.[23] The Tarriff, cited by AA in the footnote, also does not define "domestic itinerary."

Nowhere does AA explain the discrepancy in terms, not to mention explain how members of the Credit Card Class—all of whom were clearly promised a free first checked bag for domestic flights—could possibly understand or expect they would be charged a checked bag fee on a flight from Miami to St. Louis because AA somehow did not consider that "domestic." The material issues of fact regarding this claim cannot be resolved on AA's motion for summary judgment.

## B.   AA's Credit Card Offers are Crystal Clear and Amply Definite

AA says its credit card advertising was not so definite as to constitute an offer capable of acceptance.  AA SJ Br. at 22.  But AA's offer of "First Checked Bag Free" is amply definite and, frankly, *unusually* clear.  AA plastered "FIRST CHECKED BAG FREE" across a DFW Airport escalator lobby, repeated at least six times on each side of each escalator, in oversized all-caps letters. Plfs. SJ App'x 890 (AA's ads at baggage claim stated "First checked bag free" with the word "free" in extra-large type more than twice as tall as the AA logo on the touted credit card.  *Id.* at 892. AA's "wheel of fortune"-style airport campaigns specified "First checked bag free" as the first of the "FEATURED BENEFITS" why a customer should choose this credit card, *id.* at 894-6—and in case large type on the front of that display was insufficient, AA repeated the "First checked bag free" promise on the back of the display, *id.* at , and yet again on the floor in front of the display. *Id.* at 894-9. Indeed, this promise was ubiquitous in AA's advertising and solicitations, including

---

[22] It is hard to imagine how a CC Holder that applied for a credit card that promised a Free First Checked Bag is supposed to figure this out and conclude that a flight from Miami to St. Louis (for which the passenger was required to check in for in Miami) is somehow not a domestic flight.

[23] It's actually worse. In some of the advertisements, AA refers to "domestic travel" rather than "itineraries." Surely, Miami to St. Louis is "domestic travel." Plfs. SJ App'x 888.

onboard audio-video recordings, *id.* at 900, in onboard scripts, *id.* at 902-6, in onboard cocktail napkins , *id.* at 907-9, on aa.com, and on partner credit card issuers web sites. *Id.* at 30-237.

In fact, AA continues to make these same promises, worded the exact same way, to this day and despite this pending litigation.[24] ████████████, the person AA designated as most knowledgeable, testified that no changes had been made to the marketing materials in the past year. When asked ████████████████████████████████████████████████████ Plfs. SJ App'x 918 (59:7-14). Plaintiffs respectfully submit that the way to get AA to market these credit cards responsibly and truthfully is to hold them liable here for the plain words of their own advertisements. First Checked Bag Free should mean exactly what it says.

**C.   THE CITED EXAMPLES CONFIRM THAT AA'S ADVERTISEMENTS ROUTINELY PROMISED "FIRST CHECKED BAG FREE" WITH NO INDICATION THAT AA WOULD PROVIDE THIS BENEFIT ON LESS THAN ALL OF ITS FLIGHTS. EACH OF THESE PROMISES WAS BOTH CLEAR AND DEFINITE IN PROMISING A SPECIFIC, PRECISE BENEFIT.  THE CONTEXT OF AA'S CREDIT CARD OFFERS FURTHER SUPPORTS THE INCLUSION OF BENEFITS DURING INTERNATIONAL TRAVEL**

Beyond the literal text of AA's credit card offers, numerous factors support the conclusion that credit card baggage benefits were to apply on international flights.

First, some AA marketing materials explicitly state that baggage benefits apply on "every flight." *See* Plfs' SJ App'x 34, proclaiming "Enjoy perks on every flight" directly above "First checked bag free." Every means every, which obviously and necessarily includes international.  In another example, AA went so far as to title a marketing email "For your next international trip" with message body discussing a benefit of "No *foreign* transaction fee" (emphasis added) along with the promise of a first free checked bag. *Id.* at 145-6. With the checked bag benefit described in an email

---

[24] For example, recent passenger photographs confirm that the airport lobby games are continuing this winter 2022, still touting "first checked bag free" without admitting anywhere in the visible game premises that AA provides this benefit on only some of its flights. Plfs. SJ App'x 893-9.

with subject line referencing an "international trip" and other benefits on "foreign" purchases, this email fairly indicates that the baggage benefit applies on international tavel.

Second, AA's marketing materials promise free bags adjacent to large images of seemingly foreign destinations. *See id.* (depicting an apparently Mediterranean destination above "first checked bag free"); *id.* at 19, 34 (depicting someone diving into tropical waters).

Third, AA's marketing materials promise free bags adjacent to words pertaining to international travel. Sometimes large text proclaims "THE NEW AMERICAN PASSPORT," invoking the passport document widely known to be required for international travel, but not domestic travel. *See, e.g., id.*

### D.    THE COURT SHOULD ENFORCE PROMISES MADE IN AA'S MARKETING OFFERING FREE CHECKED BAGS WITHOUT INTERNATIONAL LIMITATIONS

There being no dispute that AA widely promised "first checked bag free" without limitation, the real question is whether AA's promise to provide that benefit on all flights is contractually enforecable. Certainly "first checked bag free" is clear and has a plain meaning. Can AA then in fine print limit this benefit only to bags checked on Tuesdays? Only for passengers traveling to Kalamazoo? Only on passengers traveling domestically? AA asks the Court to accept the third of these examples, though if AA can get away with that, maybe it will try the first and the second too. The Court should have none of it. "First checked bag free" means what it says and should be enforced without modification. AA's promises constituted an offer that Credit Card Class members accepted for the mutual exchange of consideration—forming a binding contract that AA then breached.[25]

---

[25]   To be clear, Plaintiffs here are not claiming breach of the separate agreements they have with the credit card issuers (Citibank and Barclays). AA is not a party to those separate agreements. Plaintiffs seek only to enforce the promise AA made to these class members directly.

29

### E.   BY ITS OWN TERMS, AA'S COC IS NOT FULLY INTEGRATED.

AA argues it cannot be held to promises it made in its marketing offers because, AA says, its CoC is fully integrated and hence all other statements are irrelevant. But the CoC, by its own terms, is *not* fully intergrated. The current CoC, for example, states that the contract bewteen AA and passenger also includes terms on a "ticket, ticket jacket, or ticket receipt"; fare rules; and tariffs. *See supra* footnote 19 (containing URL with hyperlink to CoC webpage). The CoC then links to numerous external documents including the Checked Baggage Policy. Not one of these documents ever purports to be the parties' full agreement, nor do any of these documents include a merger clause claiming to establish an integrated agreement. AA thus cannot rely on caselaw about integrated agreements.

#### 1.   AA Relies on Documents Outside the CoC and CBP

AA claims that the CoC is a complete, integrated contract. AA is wrong. AA itself relies on baggage provisions in other documents, including partner credit card terms and conditions (nowhere mentioned in CoC, CBP, or documents purportedly incorporated by reference in the CoC). For example, AA purports to grant premium credit card benefits only to those customers whose account was open 7 days prior to travel, and whose reservation included a linked frequent flier number 7 days prior to travel. Plfs. SJ App'x 921-3. But these 7-day rules appear nowhere in CoC or CBP. Rather, they appear in footnotes to the separate Citibank and Barclays agreements with Credit Card Class members and in footnotes in marketing documents. Nothing in the CoC or CBP even mention those separate agreements, not to mention link to them or incorporate them by reference.

Similarly, some AA partner credit cards grant baggage benefits to as many as 8 companions in the same reservation, while other cards grant this benefit to as few as 4. *Id.* When a passenger presents more bags than these provisions allow, AA invokes these terms in limiting the baggage benefit to the specified number of bags. *Id.* But there too, the restrictions are contained in the

separate Citibank and Barclays agreements and in marketing footnotes (AA SJ App'x 152), not in the CoC or CBP.

AA cannot have it both ways, arguing alternately that the CoC is and is not a fully integrated contract.  Having put relevant restrictions in other documents (and not in CoC or CBP), and having invoked those restrictions in its dealings with customers and even before this Court,[26] AA cannot argue that the credit card marketing materials are outside the contract.

### 2.   AA's Standard Form Documents State that "Additional Allowances and/or Discounts May Apply"

Far from the CBP being exhaustive on the subject of baggage benefits, AA's own documents indicate that additional baggage benefits are provided in additional, unstated locations.  Every AA E-ticket Email includes a Baggage Information section that systematically states the price of a first and second bag, *see supra* Sec. III(C), followed by the all-caps sentence "ADDITIONAL ALLOWANCES AND/OR DISCOUNTS MAY APPLY." *See* AA SJ App'x 238-41. Nothing in this sentence indicates that only *certain* sources, such as only the CBP, may provide the additional allowances contemplated by that sentence.  Having stated that additional allowances (stated in unspecified other documents) "apply", AA cannot be surprised to be held to the promises in its own written communications with passengers.

### F.   THE CONTENT, STRUCTURE, AND OVERALL APPROACH OF THE CBP DO NOT SUPPORT AA'S CLAIM THAT MENTIONING DOMESTIC BENEFITS "IMPLIES" NO INTERNATIONAL BENEFITS

AA makes much of CBP provisions where AA says certain credit card benefits are available on domestic itineraries (which according to AA means those benefits must not be available on itineraries that are not domestic).  But that provision, by its own terms, is additive to AA's other baggage benefits.  AA does not and cannot point to any contract provision that states credit card

---

[26] AA relied on these terms in its prior judicial submissions.  *See* Docket No. 40 at 14 n.9.

benefits are not available on international itineraries.  AA's argues that, "the checked bag benefit is available on only one type of itinerary," AA SJ Br. at 16, but the CBP and other contracts do not include the crucial word "only."

AA asks the Court to find that the CBP's  mention of certain domestic baggage benefits "implies" the exclusion of international bag benefits. *Id.* By Plaintiffs' count, the CBP alone is 1,754 words including two expandable subsections, seven bulleted lists, a table, seven small-type notes, and at least four additional documents arguably incorporated by reference.[27]  To put it generously, these provisions are not a model of clarity.  But whatever rules AA wanted to impose, AA was drafter of those rules and should have stated the rules explicitly and in no uncertain terms.  In a document of such complexity and such length, nothing should be "implied"; every rule and restriction should be stated explicitly.  Nor should the Court accept AA's invitation to narrow passengers' baggage benefits through implication or inference, particularly where AA's own marketing promises these cardholders free bags without identifying any "domestic only" limitaiton.

The structure of the CBP also supports Plaintiffs' contention that its silence on international credit card baggage benefits  is consistent with AA promising such benefits elsewhere.  The CBP promises that baggage can be checked free of charge in at least five different ways:  (1) A passenger can fly to/from a region with free bags; (2) can buy a ticket for a class of service that provides free bags; (3) can have elite status that provides free bags; (4) can have a credit card that provides free bags; or (5) can be a member of the military.  A passenger might not meet several of these criteria, but meet at least one of the others and, obviously, get baggage benefits on that basis.  In particular,

---

[27] The CBP links to documents entitled "Bag limitations," "Optional service fees" "Bag regions" and "Overweight and oversize bags."  After manually expanding ten expandable section headings in the Bag Limitations file, these documents present another 5,430 words.  AA's arguments about "the four corners" of CBP get at least a raised eyebrow based on both the volume and multiplicity of documents.  And at 7,184+ words, some 28+ pages would be required to print these documents at standard 250 words per page. That is more like 112 corners.

each of the CBP benefits is *additive* with each of the others.  That a passenger does not qualify under one, two, three, or, four of these criteria does not mean the passenger will not be entitled to free checked bags if the passenger satisfies at least one.

Tellingly, the CBP fails to mention at least five other situations that even AA acknowledges entitle passengers to check baggage free of charge.[28]  AA asks the Court to find that the CBP is comprehensive, and that any promise of free checked baggage in credit card promotions not mentioned in CBP must, as a matter of law, not exist.  Yet the five examples show that AA routinely promises baggage benefits not mentioned in CBP.[29]  None of these benefits is any less part of AA's obligations to passengers merely because AA, for whatever reason, failed to state such benefit in CBP and failed to align CBP with its promises elsewhere.  The same is true of AA's marketing promises of free checked bags to cardholders without any "domestic only" limitation.

Nor could AA fob off those five additional benefits by arguing that CBP is comprehensive with respect to the types of benefits it discusses.  To wit, the CBP discusses baggage benefits for

---

[28] 1) In the Airpass program, passengers prepay for certain airfare and get a suite of benefits including checking baggage free of charge even when not otherwise entitled to free bags.  *See* Plfs. SJ App'x 923-4. 2)Elite passengers get benefits not just for themselves, but also for certain companions in their reservations (*id.* at 923), though CBP again fails to say so.  3) Similarly, passengers with certain partner credit cards get benefits for certain companions, a benefit again not mentioned (nor the number of such companions indicated) in CBP but rather in credit card terms and marketing offers. *See, e.g.,* AA SJ App'x 152. Passengers whose tickets were issued by other airlines are typically entitled to the baggage benefits those airlines, even when they travel on AA, even if those benefits are greater than AA's benefits (14 C.F.R. §§ 399.85(c) and .87).  AA was unable to find any contract promising or web site statement promising to comply with this requirement, and when pressed by Plaintiffs, AA offers only ▮▮▮▮▮▮▮ Decl. ¶12 (Plfs. SJ App'x 924) which quotes a provision by its terms limited to travel to/from Canada.  5) AA employees are permitted to check two bags at no charge.  *Id.*

[29] Because the CoC is incomplete, it is not entitled to any presumption of integration. *R & P Enters. v. La Guarta, Gavrel & Kirk, Inc.*, 596 S.W.2d 517, 519 (Tex. 1980) (holding that, for an ambiguous contract, "extraneous evidence is admissible to determine the true meaning of the instrument. Normally, a summary judgment based on such a record is improper."); *Bob Robertson, Inc. v. Webster*, 679 S.W.2d 683, 688 (Tex. App. 1984); *FDIC v. White*, No. 13-08-00263-CV, 2011 Tex. App. LEXIS 8344, *19 (Tex. App. Oct. 20, 2011); *Chaparral Tex., L.P. v. W. Dale Morris, Inc.*, No. H-06-2468, 2008 U.S. Dist. LEXIS 4397, *14, *22 (S.D. Tex. Jan. 22, 2008); *Weinacht v. Phillips Coal Co.*, 673 S.W.2d 677, 680 (Tex. App. 1984).

elite passengers, but the related subject of companions of elite passengers (traveling in the same reservation) is discussed only in the Elite Status Benefits ("ESB") page and not in CBP, CoC, or any page incorporated by reference. *See* Plfs. SJ App'x 923. Since AA chose to present some elite benefits in CBP but others in ESB, AA is wrong to claim that credit card baggage benefits cannot also be listed in multiple places. Whether this benefit exists is, at the least, a genuine issue of material fact for a jury to decide.

The Court should be particularly hesitant to determine what the CBP supposedly "implies" given that AA's approach to baggage benefits routinizes *contradictory* statements within the CBP. Consider, for example, the CBP's statement (at heading "Charges") that for domestic travel, the first checked bag costs $30—yet the CBP's simultaneous provision of at least five categories of exceptions, as detailed in footnote 28. Nor are these contradictions limited to the "Charges" table. For example, the CBP's Cuba section says (among other things) "Trips originating in the U.S. or Canada to Cuba pay the applicable 1st bag fee"—but this too is incorrect, because all five of the listed exceptions remove that fee. When AA chooses to structure its baggage policy through a multiplicity of fees riddled with equally many exceptions, AA creates a web of complexity in which nothing is fairly "implied," but rather AA's literal statements can only be taken at their ordinary and literal meaning. The fact is, AA's CBP says nothing, one way or the other, about baggage benefits on international flights—but other AA documents regularly indicate that such benefit applies without limitation.

### G. NO CONTINGENCY EXCUSES DISHONORING AA'S CREDIT CARD BAGGAGE PROMISE

AA argues that a credit card benefit is contingent on the card being issued to that customer (*e.g.,* after the credit card company finds the applicant creditworthy). AA SJ Br. at 19. But the application process has no bearing on the benefits the cardholder is to receive if he is issued a card.

AA's "wheel of fortune" ads illustrate the point: They say "APPLY TODAY" followed by listing the benefits the customer will receive if the application is granted. The stated contingency is whether the card will be granted, not whether the benefits are provided to cardholders.[30]

### H.    CLASS MEMBERS Believed "FIRST CHECKED BAG FREE" MEANS WHAT IT SAYS

AA makes much of what Plaintiff Dr. Ferrigni says he "understood."   But Dr. Ferrigni's interpretation is reasonable and entirely consistent with the on-board credit card solicitation he received.   Furthermore, he is joined by scores of other Credit Card Class members who likewise believed AA promised them a "free bag" with a co-branded AA credit card and who took the affirmative step to complain about it to AA.   *See* Plfs. SJ App'x 288-341. No doubt countless other customers have been surprised at being charged in this scenario as well.

AA's claims about the "majority" of credit card marketing documents mentioning a domestic restriction, AA SJ Br. at 7, are disputed and not resolvable on summary judgment.   In its motion and exhibits, AA presents hand-selected "examples," ignoring the large number of documents that have no domestic restriction.   On this record, the Court certainly cannot determine in AA's favor  that the "majority" of the marketing documents included a domestic limitation (not that "majority" would excuse AA's conduct).   That said, Plaintiffs submit that the record suffices to find that there was (and to this day is!) major, widespread promotion of AA credit cards without the "domestic" restriction.   AA should be bound by what it promised.

## VI.    CLASS CLAIMS ARISING ON OR AFTER SEPTEMBER 16, 2013, ARE WITHIN THE APPLICABLE FILING PERIOD

Under Texas law, the statute of limitations for breach of contract is four years. *See* Tex. Civ. Prac. & Rem. Code Ann. § 16.501. AA argues that "any claim that arose prior to February 24,

---

[30] Nor is there any serious suggestion of card provisions "open for negotiation" (AA SJ Br. 21-23). A Credit Card Class member who accepted AA's offer can no more negotiate for extra benefits (more miles earned or extra free bags) than a customer can negotiate the fare AA demands for air transportation.

2017…should be dismissed without prejudice" because it is not timely made. AA SJ Br. at 36. This is incorrect because: (a) AA misstates the date this case began; and (b) AA erroneously asserts that tolling of class claims does not apply. The Court should find timely any Class member claims after September 16, 2013.[31]

### A. THIS CASE WAS FILED ON SEPTEMBER 4, 2020

AA states that this matter began on February 24, 2021, and therefore the statute of limitations must be calculated backwards from that date.[32] AA SJ Br. at 33-4. This is simply incorrect. Plaintiffs filed the present case on September 4, 2020 in the Central District of California. Plfs. SJ App'x 931-53. AA moved for, and Plaintiffs later consented to, *transfer* of the matter to this Court. *Id.* at 954-81. The transferred filing contains the same Plaintiffs, Defendant, class, and allegations.[33] In every respect, this is the same case as the California filing. AA acknowledged as much when it moved to transfer this matter, in AA's own words preferring transfer to dismissal, stating, "American therefore moves to *transfer this action* to the U.S. District Court for the Northern District of Texas under 28 U.S.C. § 1406(a)." *Id.* at 961 (emphasis added). Even without tolling, the SOL period should be calculated backwards from September 4, 2020.[34]

---

[31] Notice of Class Certification was issued to all members of the Classes identified by AA for the Class Period beginning on September 16, 2013. Docket No. 66.

[32] AA is well aware of Plaintiffs' tolling arguments from the briefing on class certification. To the extent AA is saving its arguments for reply, Plaintiffs should be given an opportunity to respond to those arguments.

[33] The transferred case was initally assigned to Judge Pittman but upon correction of a filing error was assigned to this Court. Plfs. SJ App'x 983-5.

[34] Assuming *arguendo* that the California filing was a separate matter, the pendency of that case would have tolled the statute of limitations for the claims here. *See infra* Sec. VI(B)(2).

**B.    BECAUSE *BAZERMAN* TOLLED THE STATUTE OF LIMITATIONS FOR CLASS MEMBERS' CLASS CLAIMS, THE APPLICABLE FILING PERIOD BEGAN ON SEPTEMBER 16, 2013**

**1.    The *Bazerman* Class Action Tolled the Statute of Limitations**

"[T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action." *American Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 554 (1974); *accord Crown Cork & Seal Co. v. Parker*, 462 U.S. 345, 350 (1983) ("The filing of a class action tolls the statute of limitations as to all asserted members of the class, not just as to intervenors.") (quotation marks and citations omitted).[35] As explained below, *Bazerman v. Am. Airlines, Inc.*, No. 17-cv-11297-WGY (D. Mass. July 13, 2017), tolled the statute of limitations for the Classes' claims asserted in this action.

*Bazerman*, filed on July 13, 2017, was a class action filed against AA concerning, as here, erroneously charged baggage fees.  The putative class in *Bazerman* encompassed:

> All persons in the United States (including the fifty states, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico) who purchased a ticket for air travel on American Airlines ("AA") subject to AA promises that their ticket would allow the passenger to check a specified number of bags at no additional charge, when in fact AA required the passengers to pay to check one or more such bags, during the period since four years prior to the filing of the complaint.

Plfs. SJ App'x 1007.  The *Bazerman* court never determined whether that class warranted class treatment because the case settled before certification.  In approving the settlement, the court certified a more narrow settlement class:

> All residents of the United States (including the fifty states, the District of Columbia, the U.S. Virgin Islands, and Puerto Rico) who:
> a.    traveled on American Airlines ("American"),
> b.    at any time between July 13, 2013 and the Settlement Date (the "Class Period"), and

---

[35] Federal decisions interpreting the statute of limitations and tolling apply here.. "[T]he Supreme Court has stated that generally, for diversity actions, a federal court should apply not only state statutes of limitation but also any accompanying tolling rules." *Vaught v. Showa Denko K.K.*, 107 F.3d 1137, 1145 (5th Cir. 1997) (citing *Walker v. Armco Steel Co.*, 446 U.S. 740, 750-53 (1980)).

c. meets the criteria of either or both subsections (1) and (2) below:

(1) were charged a checked bag fee inconsistently with statements in American's Baggage Policy that passengers may check one or more bags for no additional charge, excluding oversized and overweight checked bags, specialty items, and sports equipment, for any of the following reasons:

   i. At the time of check-in, the passenger held a First or Business Class ticket for a domestic flight;

   ii. At the time of check-in, the passenger held a Business Class ticket for an international flight;

   iii. At the time of check-in, the passenger held AAdvantage elite status with American or an equivalent frequent flyer elite status with a partner airline, or traveled on the same itinerary as a passenger who held such status;

   iv. At the time of check-in, the passenger was an active U.S. Military member or the dependent of a U.S. Military member travelling on orders;

   v. At the time of check-in, the passenger was an active U.S. Military member on personal travel.

(2) were charged a checked bag fee inconsistently with a Confirmation Email received by the passenger stating eligibility to check a first bag for that ticketed trip at no additional charge.

Plfs. SJ App'x 1016-8. The court approved the settlement class as proposed on April 8, 2019. Plfs. SJ App'x 1027-9 (final settlement order).

The Classes certified in this case fall within the original class alleged in the *Bazerman* complaint. However, the *Bazerman* settlement class did not include members of the Credit Card Class certified in this case. The Email Class excludes claims released in the *Bazerman* settlement.

Without tolling, AA would gain something it did not bargain for: a release of claims for which it provided no relief. The *Bazerman* court approved a settlement releasing the claims only of those in that settlement class. Without tolling and the benefit of the class action mechanism, AA would effectively be getting a release from members of the Classes here—individuals who were excluded from the *Bazerman* settlement. Few if any members of the Classes would bring an individual claim for $25 (AA's historic standard first bag fee) which is less than the filing fee for an

38

individual action.  If there is no tolling here, AA would accomplish what it did not do in *Bazerman* (and could not do here): effectively obtain a denial of class certification.

### 2.     *Bazerman* Tolled the Classes' Claims in this Action

Under the *American Pipe / Crown Cork* rule, the Classes' claims in this action were tolled during the pendency of the *Bazerman* action.   AA asserts that these certified Classes's claims are not entitled to <u>any</u> tolling based on *Bazerman* and therefore any claims arising prior to February 24, 2017 are barred by the statute of limitations.  AA is wrong.

*Crown Cork* and *American Pipe* compel tolling. In addition to holding that a class action suspends the statute of limitations for members of the putative class, the Court further held that, *where class action status has been denied*, members of the failed class may timely intervene as individual plaintiffs in the suit. 414 U.S. at 554, 553. These two holdings interact to protect both putative class members who could reasonably rely on a pending class action to protect their interests while protecting a defendant from a plaintiff "who has slept on his rights[.]" *Id.* at 554-5 (internal quotation marks omitted).

AA argues that *China Agritech v. Resh*, 138 S. Ct. 1800 (2018), precludes tolling of class claims. Mot. at 35-6.  In *China Agritech*, the Supreme Court held that an action *in which class certification is denied* tolls putative class members' individual claims, but not their class claims. *Id.* at 1804.  That rule has no application here.  Because neither the *Bazerman* court, nor any other, denied class certification to the Classes certified in this action, *China Agritech* does not change the *American Pipe / Crown Cork* rule of class action tolling.  A majority of courts to consider the question agree.

Since *China Agritech*, federal courts have applied *American Pipe* tolling to class claims when no definitive class certification decision has been made.  *See, e.g., Betances v. Fischer*, 403 F. Supp. 3d 212, 223 ("*China Agritech* only applies when class action status previously has been denied[.]"); *Hart v. BHH, LLC*, No. 15cv4804, 2018 U.S. Dist. LEXIS 188189, *5 (S.D.N.Y. Nov. 2, 2018).

Importantly, the Fifth Circuit, albeit before *China Agritech*, held that, while an earlier class action tolls the statute of limitations for claims of its putative class members, the tolling limitations of *American Pipe* and its progeny do not apply when there has been no denial of certification. *Taylor v. UPS, Inc.*, 554 F.3d 510, 521 (5th Cir. 2008) (Concerning an individual suit, holding "[B]ecause the [earlier class action's] district court did not deny class certification, *American Pipe, Crown, Cork & Seal*, and *Calderon* are inapposite.").

Plaintiffs acknowledge a recent decision in this District (currently on appeal) held that *China Agritech* applies to bar tolling of class claims even when the earlier class action involves no class determination whatsoever. *Ochoa v. Pershing LLC*, No. 3:16-CV-1485-N, 2021 U.S. Dist. LEXIS 214299, *11 (N.D. Tex. Nov. 5, 2021). The *Ochoa* court noted that applying *China Agritech* to the facts would be an extension of its holding, and noted that doing so "risks leaving potentially blameless litigants without recourse where the unilateral action of a third party cuts them out of a class after the limitations period has run." *Id.* at *8-9.[36] Plaintiffs respectfully submit that the Court should not follow *Ochoa*. It is contrary to Fifth Circuit authority (*Taylor*, 554 F.3d at 521) and the weight of persuasive caselaw around the country, it is contrary to the logic of *American Pipe* and improperly extends *China Agritech*, and is currently on appeal.[37]

Applying *Ochoa* to preclude tolling of class claims here would frustrate the interests underlying *China Agritech*, *American Pipe* and *Crown Cork*. Applying *Ochoa* or *China Agritech* to bar the tolling of class claims here would deny recourse to Class members who reasonably relied on the pendency of a filed class action to protect their interests. Morover, it would incentivize a flood of

---

[36] Finding that "[t]he Supreme Court…crafted the rule that it did in [*China Agritech*] primarily to maximize efficiency and, in so doing demonstrated a preference for early involvement by competing class representatives and claims as the proper way for litigants to protect their interests[,]" the *Ochoa* court extended the tolling limits of *China Agritech* to any class filing, even if the class representative unilaterally excises class members from the proposed class. *Id.* at *9, *11.

[37] To the extent the Court is considering following *Ochoa*, Plaintiffs submit that the Court should await the result of the appeal in that case before doing so.

motions from putative class members merely trying to ensure their claims would be included, because they could no longer rely on the pendency of the class action to preserve their claims. It is unclear what the *Ochoa* court would have preferred the class members here to do. *American Pipe* and its progeny stand for the proposition that Rule 23 and the courts do not want all class members jumping in early to protect their rights. *Ochoa* would force the opposite. In other words, following *Ochoa* would make the judicial process less fair to "blameless litigants"[38] *and* less efficient.

 *China Agritech* in no way precludes tolling class claims here. "What the Rules do not offer is a reason to permit plaintiffs to exhume *failed class actions* by filing new, untimely class claims." *Id.* at 1811 (emphasis added). By drawing the line at denial, the *China Agritech* Court upheld principles of judicial economy while also protecting the claims of plaintiffs whose reliance on the class action means that they have not slept on their rights. *Id.* at 1808 (emphasis added). If a court denies certification, it does so after determining that class treatment was not appropriate, and thus only tolling individual claims is justified. But if there is no ruling on the appropriateness of class treatment, no such limitation is warranted and the claims of the class should be tolled.

### C.  *BAZERMAN* TOLLED CLASS CLAIMS FOR 1084 DAYS[39]

 *Bazerman* was filed on July 13, 2017. Plfs. SJ App'x 987. The court entered final judgment on April 8, 2019, but only as to the claims released by the settlement. Plfs. SJ App'x 1035 ("The Action is hereby dismissed on the merits and with prejudice *as to the released claims*) (emphasis added). By its own terms, the April 8, 2019 judgment did nothing to the unreleased claims. Thus the unreleased claims remained pending before that court—until the court gave its final ruling and closed the

---

[38] *American Pipe* was explicitly concerned about this type of unfairness: "Not until *the existence and limits of the class have been established* and notice of membership has been sent does a class member have any duty to take note of the suit or to exercise any responsibility with respect to it in order to profit from the eventual outcome of the case." 414 U.S. at 552 (emphasis added). The cases tailoring *American Pipe* carefully remained on the equitable side of the class certification line.

[39] "[T]olling continues until the judgment in the case becomes final or until a final adverse determination is made…. [I]f no appeal is taken, the judgment becomes final when the time for appeal ends." *Taylor*, 554 F.3d at 520

docket on July 1, 2020. Plfs. SJ App'x 1040. Thus only upon that final ruling did those unreleased claims cease to be before the *Bazerman* court, and only then would a reasonably diligent class member monitoring the case (through PACER or otherwise) be on notice that her interests are no longer being protected in litigation. July 13, 2017, to July 1, 2020, is a span of 1084 days, the length of time *Bazerman* tolled the clock here. Therefore, the applicable filing period began four years and 1084 days before the filing of this case on September 4, 2020. Four years plus 1084 days prior to September 4, 2020, is September 16, 2013.[40]

In the alternative, if the Court finds that the operative event in *Bazerman* was the filing of the order of judgment, the Court should nevertheless preserve as timely all claims arising on or after November 19, 2014. The window for filing a notice of appeal of the final judgment order closed on May 8, 2019.[41] July 13, 2017, to May 8, 2019, is a span of 655 days. Four years plus 655 days prior to September 4, 2020, is November 19, 2014. [42]

| Extent of Tolling | Days Tolled | Class Period |
|---|---|---|
| Through Bazerman final ruling | 1084 | September 16, 2013, to present |
| Through Bazerman final judgment | 655 | November 19, 2014, to present |
| No tolling | 0 | September 4, 2016, to present |

## VII.    FOREIGN CLASS MEMBERS' CLAIMS SHOULD NOT BE DISMISSED

The certified Classes include residents of other countries. This was no mistake. AA overcharged customers regardless of their citizenship, and as an international airline AA can hardly

---

[40] Plaintiffs understand that the calculation for tolling may be confusing and respectfully submit that the Court should order further briefing if it agrees that tolling is appropriate.

[41] Notice of appeal of a final judgment must be filed within 30 days. FED. R. APP. P. 4(a)(1).

[42] If the Court is considering this case to be a separate matter from the California filing, then that filing was itself the commencement of a class action that calls for tolling. This matter was pending in California for 155 days.

be surprised to have customers residing worldwide.  Nonetheless, AA now argues that this Court should dismiss the claims of all foreign Class members because Plaintiffs have not demonstrated that foreign jurisdictions would recognize the preclusive effect of a judgment from this Court.

The Court should reject AA's plea—essentially a motion to decertify the classes—for two reasons.  <u>First</u>, AA waived this argument when it failed to raise it at class certification.  <u>Second</u>, a substantial number of Class members' claims will be recognized as preclusive in their home jurisdictions, and the risk of foreign suits is low, diminishing *res judicata* concerns.

### A.    AA Waived the "Foreign Class Member" Argument by Failing to Raise It at Class Certification

Whether a foreign jurisdiction would recognize the preclusive effect of a class judgment is an aspect of a superiority determination under Rule 23(b)(3).  *Buettgen v. Harless*, 263 F.R.D. 378, 382 (N.D. Tex. 2009) (analyzing whether Swiss national appropriate as lead plaintiff under Fed. R. Civ. P. 23(b)(3)); *In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. 76, 95 (S.D.N.Y. 2007) *aff'd In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, (2d Cir. 2016*)* ("[R]es judicata concerns have been appropriately grafted onto the superiority inquiry.") (cited by the Northern District of Texas in *Troice v. Proskauer Rose Llp*, No. 3:09-CV-1600-N-BG, 2015 U.S. Dist. LEXIS 198490, *8 (N.D. Tex. Mar. 9, 2015)).  A *res judicata* concern is one of many factors which might impact superiority.  *Id.* ("It does not appear, however, that *res judicata* concerns should be dispositive without either an evaluation of the likelihood of nonrecognition *or a consideration of other factors* which impact a determination of the superiority requirement.") (emphasis added); *In re U. S. Fin. Sec. Litig.*, 69 F.R.D. 24, 49 (S.D. Cal. 1975) ("[T]he issue of *res judicata* was *one* of several factors to be considered[.]") (citing *Bersch v. Drexel Firestone, Inc.*, 519 F.2d 974 (2d Cir. 1975)).  The court should exercise its own discretion when determining the weight placed on this factor.  *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d at 264

("Concerns about foreign recognition of our judgments are reasonably related to superiority… It was therefore within the district court's discretion to take that risk into account.").

AA raises this concern about the superiority of class treatment, as to international class members, for the first time in its summary judgment briefing.  Although AA could have made a motion to decertify the Classes, it did not and has no basis to do so.  AA does not assert any facts learned after certification that justify cutting foreign members out of the Classes.  Nor does AA claim any post-certification legal developments affect the Court's class determination.  In essence, this aspect of AA's Motion is an improper attempt to re-litigate class certification.  The Court should deny it for that reason alone.

### B.   *Res Judicata* Concerns are Not so Significant that the Court Should Modify its Order for Class Certification

AA does not even pretend to do the work required to exclude foreign members of the class. Excluding foreign residents from the classes requires an analysis of each individual foreign jurisdiction, which AA has not done.  *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 U.S. Dist. LEXIS 91938, *23 (S.D. Tex. June 15, 2017) ("Potential *res judicata* issues do not preclude class certification or require that all foreign purchasers be excluded from the class ….");[43] *see also In re Petrobras Sec. Litig.*, 312 F.R.D. 354, 363 (S.D.N.Y. 2016) ("While defendants also propose including in the Class definitions lists of countries whose residents would be excluded from the Classes … defendants have not explained in any detail why these particular countries would not recognize a U.S. class action judgment in this case. Accordingly, the Court concludes that foreign *res*

---

[43] The court also held that, when defendant only raises speculative res judicata concerns, the issue is not appropriate at class certification: "Defendants argue that foreign purchasers should be excluded from the class because their home jurisdiction may not enforce the resulting judgment. The *res judicata* effect of any judgment from this case in another country is not before this Court. That issue will be addressed by the appropriate court when and if a judgment against a Defendant is entered." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, 2017 U.S. Dist. LEXIS 91938 at *22-23.

*judicata* concerns are not a bar to the superiority of a class action and declines to list any specific countries in the Class definitions.").

Worldwide litigation in this court is particularly natural because the CoC itself states that Texas law applies to all disputes at issue in this case, and that any court hearing such disputes will apply Texas law. AA SJ App'x 288. Certainly, Texas law recognizes the preclusive effect of judgments in other cases that applied Texas law. Therefore, according to AA's logic, no res judicata concerns exist because any foreign court would be obliged to apply Texas law and would therefore be compelled to recognize a judgment by this Court.

Additionally, the less likely that AA will face a significant number of lawsuits in foreign jurisdictions, the lower the *res judicata* concerns. *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. at 106-7 ("[T]he Court should not ignore practical realities that reduce the risk that defendants would in fact be prejudiced by any potential nonrecognition… In this sense, defendants' res judicata concerns are 'more hypothetical than real[.]'"). According to AA's motion to transfer, "a majority of the Plaintiffs agreed to" a forum selection clause, which "obligates suits arising out of [the] use of American's website to be filed in Tarrant County, Texas." Plfs. SJ App'x 964. Moreover, the cost of litigation means that there is little to no risk of class members suing individually in a foreign jurisdiction, and those jurisdictions with some form of collective action would likely recognize a judgment here. *See In re Vivendi Universal, S.A. Sec. Litig.*, 242 F.R.D. at 101-5. AA wants it both ways, arguing when it benefits them that all claims must be tried under Texas law and that most claims must be brought in Texas, yet now arguing without evidence that the same claims carry a large risk that they will be tried again in foreign jurisdictions applying foreign law.

Although it is not Plaintiffs' burden to show, many foreign jurisdictions would likely recognize a judgment in this case. Numerous countries have some form of class or collective action.

*Id.* at 104-5.[44] Domestic courts have included in class actions foreign residents from many jurisdictions. The *Vivendi* court held that the courts of England, France, and The Netherlands are more likely than not to recognize a class judgment, and on that basis declined to exclude residents of those countries from the class. *Id.* at 95-6, 102-3, 105 (S.D.N.Y. 2007).   In *Anwar v. Fairfield Greenwich*, the court considered whether foreign jurisdictions are likely to recognize a class judgment in the United States and certified a class which included residents of The Netherlands, Curaçao, Spain, Portugal, Sweden, Greece, Malta, Norway, Finland, Belgium, Italy, Denmark, Argentina, Bolivia, Brazil, Chile, Colombia, Dominican Republic, Ecuador, El Salvador, Mexico, Peru, Uruguay, Venezuela, the United Kingdom, Canada, and other common law jurisdictions. 289 F.R.D. 105, 115-121 (S.D.N.Y. 2013), remanded on other grounds by *St. Stephen's Sch. v. PricewaterhouseCoopers Accountants N.V.*, 570 F. App'x 37 (2d Cir. 2014).

There is another good reason for placing the burden on AA to show that residents of certain countries should be excluded:  From its business records, AA substantially knows where members

---

[44] *See also,*
https://www.google.com/url?sa=t&rct=j&q=&esrc=s&source=web&cd=&ved=2ahUKEwi2p9P3rIPqAhVJqJ4KHTSuBfAQFjABegQIARAB&url=https%3A%2F%2Fwww.fasken.com%2F-%2Fmedia%2F01725d014e744a44beb7f5266754ff7c.ashx&usg=AOvVaw2nW8Ew5wLm0aoNlhNAICYn (**Canada**); https://www.ashurst.com/en/news-and-insights/legal-updates/quickguide-class-actions-in-australia/ (**Australia**); https://uk.practicallaw.thomsonreuters.com/3-617-6671?transitionType=Default&contextData=(sc.Default)&firstPage=true&bhcp=1 (**New Zealand**); https://www.jonesday.com/en/insights/2012/03/new-class-action-rules-in-mexico-create-significant-risks-for-companies-doing-business-in-mexico (**Mexico**); https://content.next.westlaw.com/Document/I085e923e360511e598dc8b09b4f043e0/View/FullText.html?contextData=(sc.Default)&transitionType=Default&firstPage=true&bhcp=1 (**Brazil**); https://uk.practicallaw.thomsonreuters.com/2-617-5865?transitionType=Default&contextData=(sc.Default)&firstPage=true (**Italy**); https://www.mondaq.com/india/class-actions/809134/class-action-suits-in-india-government-notifies-thresholds-for-filing-class-action-suits (**India**); http://globalclassactions.stanford.edu/sites/default/files/documents/Malaysia_National_Report.pdf (**Malaysia**); http://globalclassactions.stanford.edu/sites/default/files/documents/THAILAND.pdf (**Thailand**); http://globalclassactions.stanford.edu/sites/default/files/documents/SOUTH%20AFRICA.pdf (**South Africa**).

of the Classes reside. Nonethleess, AA has not demonstrated that any residents of foreign jurisdictions should be removed from the certified classes. If AA wanted to exclude such people, it should have shown in their motion (1) which specific jurisdictions would not recognize a judgment from this Court, and (2) good cause excusing the failure to raise this issue when given the full and fair opportunity to litigate it.

## VIII.   THE CERTIFIED CLASSES SHOULD BE PERMITTED TO ADD ADDITIONAL CLASS REPRESENTATIVES IF NECESSARY

Should the Court determine that any Plaintiff's claim should be individually dismissed, Plaintiffs should be permitted to add additional class represenatives. *See Carpenter v. Stephen F. Austin State Univ.*, 706 F.2d 608, 617–18 (5th Cir. 1983) ("[I]f after the class has been certified and its claims heard and the representatives are found to be inadequate for some reason during the course of the class claims…the appropriate step is appointment of new representatives from the existing class"); *see also Sosna v. Iowa*, 419 U.S. 393, 399 (1975) (once a class is certified, it "acquires a legal status separate from that of the named plaintiffs"); *Mississippi Protection & Advocacy Sys. v. Cotten*, 929 F.2d 1054, 1058 (5th Cir. 1991) (affirming district court which permitted substitution of named plaintiff pursuant to FED. R. CIV. P. 15 because defendant was not prejudiced by amendment as it did not change the nature of the lawsuit).

AA's records reveal over 1 million members of each certified Class. Should it be necessary, additional class representatives could be added shortly after the Court's summary judgment decision and any discovery of them promptly completed. Permitting substitution would best serve the interests of the certified Classes, and serve justice and judicial efficiency.

## IX.     CONCLUSION

For the reasons stated herein, AA's Motion for Summary Judgment should be denied.

Dated:  March 17, 2022

Respectfully submitted,

s/ Oren Giskan

Oren Giskan (*pro hac vice*)
**GISKAN SOLOTAROFF
  & ANDERSON LLP**
90 Broad Street, 2d Floor
New York, NY 10004
Telephone: (212) 847-8315
Facsimile: (646) 964-9610
ogiskan@gslawny.com

*Counsel for Plaintiffs
and Lead Class Counsel*

Joseph S. Tusa, Esq. (*pro hac vice*)
**Tusa P.C.**
P.O. Box 566
55000 Main Road, 2nd Fl.
Southold, NY 11971
Telephone: (631) 407-5100
joseph.tusapc@gmail.com

**LIEFF, CABRASER, HEIMANN
  & BERNSTEIN, LLP**
Roger Heller (*pro hac vice*)
rheller@lchb.com
275 Battery Street, 29th Fl.
San Francisco, CA  94111-3339
Telephone: (415) 956-1000

- and -

Christopher E. Coleman (*pro hac vice*)
ccoleman@lchb.com
222 2nd Ave. South, Suite 1640
Nashville, TN  37201
Telephone: (615) 313-9000

*Counsel for Plaintiffs
and Class Counsel*

Mark Alexander
State Bar No. 01007500
**MARK A. ALEXANDER, P.C.**
5080 Spectrum Drive, Suite 850E
Addison, Texas 75001
Telephone: (972) 544-6968

Facsimile: (972) 421-1500
mark@markalexanderlaw.com

Michael C. Eyerly (*pro hac vice*)
**DEBLASE BROWN EYERLY LLP**
680 South Santa Fe Avenue
Los Angeles, CA 90021
Telephone: (310) 575-9955
Facsimile: (310) 575-9919
deblase@dbelegal.com
eyerly@dbelegal.com

*Counsel for Plaintiffs*